**ARGO MARINE SYSTEMS, INC.,**
**Plaintiff-Appellant,**

v.

**CAMAR CORPORATION,**
**Defendant-Appellee.**

**No. 341, Docket 84–7563.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1984.
Decided Feb. 19, 1985.

Stuart A. Jackson, New York City (Law Offices of Stuart A. Jackson, John A. Harras, New York City, of counsel), for plaintiff-appellant.

Douglas R. Burnett, New York City (Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, Richard H. Webber, New York City, of counsel), for defendant-appellee.

Before OAKES and WINTER, Circuit Judges, and CLARIE, District Judge.[*]

*Honorable T. Emmet Clarie, Senior United States District Judge for the District of Connecticut, sitting by designation.

**1008**

CLARIE, District Judge:

In the trial court, the plaintiff-appellant, Argo Marine Systems, Inc. (hereinafter "Argo"), sought compensation from the defendant-appellee, Camar Corporation (hereinafter "Camar"), in the form of orally agreed upon commissions represented to be due to the plaintiff as the result of its being appointed as a sales agent for the defendant. Argo claims to have marketed or contributed to the procurement of sales of Camar's inert gas system (hereinafter "IGS"), invented and manufactured by Camar; or, in the alternative, that Camar agreed, orally, to compensate it for sales of IGS made by the defendant in territory purportedly assigned exclusively to Argo.[1]

On appeal, Argo contends: that the trial court erred in finding the plaintiff's principal witness unworthy of belief; that the decision of the trial court to dismiss plaintiff's complaint was based upon a misapprehension of controlling legal principles regarding the formation of contracts and the earning of commissions; that the factual findings of the trial court regarding the agreement between the parties, and the sales efforts expended by Argo were clearly erroneous; that the trial court erroneously dismissed plaintiff's second, third and eighth causes of action at the close of plaintiff's case; and, that the trial court's award of discovery sanctions against the plaintiff, pursuant to Rule 37 of the Federal Rules of Civil Procedure, 102 F.R.D. 280, was improper.

### FACTS

At the times relevant to this appeal, Camar Corporation of Worcester, Massachusetts was in the business of manufacturing inert gas systems ("IGS"). An IGS system cools and cleans the exhaust gases from a tanker vessel's boiler before its distribution to the ship's cargo tanks. This inert gas prevents an explosive atmosphere from forming in the empty tanks. As of June 1, 1981, the IGS became a legal requirement for all tankers over 70,000 DWT trading in United States waters. There were approximately 35 U.S. ships affected by this proviso and their identities were commonly known in the marine industry and to Camar. Furthermore, of these, only 12–15 required retrofits, i.e., IGS.

In April 1970, E.R. Franklin became Camar's worldwide agent. Due to physical injuries which Franklin sustained in an accident, and his resulting hospitalization, Camar cancelled the arrangement it had with him, in March, 1980. Camar, just prior thereto, had begun negotiations with Argo, seeking to retain the latter to sell its IGS product. Argo is a marine and industrial supply house which sold, among other things, pollution control equipment and specialty marine paraphernalia. Previously, said corporation had been approached by Franklin himself who, as worldwide agent for Camar, was exploring the possibility of an agreement between Argo and the E.R. Franklin Company to help distribute Camar's IGS. On June 9, 1980, a document entitled "Distributor Agreement", which had been prepared and drafted by Eric Nietsch, an employee of Argo, was submitted to Camar for its approval and execution. Camar amended the proposed agreement and returned it to Argo for its signature. Argo never signed the document.

As drafted, the Distributor Agreement purported to give Argo the exclusive right to market the products of Camar in the United States, Greece, the United Kingdom, Italy and Monaco. However, before it signed the document, Camar struck references to Greece, the United Kingdom, Italy and Monaco from that portion of the agreement which defined the territory encompassed therein. The proposed contract provided in clear cut terms that:

---

1. Prior to oral argument on this appeal, Camar Corporation filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts. However, the parties have stipulated that the automatic stay imposed by 11 U.S.C. § 362(a)(1) be modified to allow for the continuation of this appeal. Said stipulation was entered as an order of the Bankruptcy Court on October 18, 1984.

The relationship between Camar and Argo is that of a Seller and Purchaser only. Argo, its Agents, Representatives and/or employees *shall under no circumstances be deemed agents or representatives of Camar....* (emphasis added)

After submitting to Camar the Distributor Agreement which it had originally drawn up, Argo apparently experienced a change of heart and thereafter was no longer· desirous of a distributorship relationship whereby it would be obligated to pay the purchase price and marketing costs of Camar's IGS. Instead, Argo wished to act as Camar's agent or representative. Notwithstanding the Distributor Agreement which *it* drafted Argo claimed at trial, and maintains on this appeal, that it was agreed that Argo would be Camar's exclusive sales agent in the United States and, as such, would be entitled to a ten per cent commission on all IGS sales made in that territory.

The trial court found that Camar had made it clear to Argo that pending the resolution of whether Argo would agree to become the purchaser and pay for IGS manufactured by Camar under the Distributor Agreement, the only basis for allowing any compensation to Argo would be in those instances where Argo sold a system in a transaction in which Camar was not called upon to participate. The court below held that at no time did Camar create a reasonable expectancy that Argo would be entitled to commissions on sales made by Camar, where Argo had not actually produced the order.

## DISCUSSION

I. *The Trial Court's Finding That Plaintiff's Principal Witness Was Unworthy Of Belief*

To a very great extent, the trial in this case was dominated by a question of credibility. Plaintiff's witnesses testified to the existence of a sales agency agreement with the defendant and to numerous acts on their part which purportedly resulted in several sales of the defendant's IGS. On the other hand, the defendant's witnesses represented that no such agency arrangement had been agreed to and that the plaintiff was not in fact a procuring cause of any of its IGS sales. The trial court found the testimony of the defendant's witnesses more worthy of belief and that the plaintiff failed to sustain its burden of proof to establish its claim to compensation by a fair preponderance of the believable evidence. The trial judge's finding was based on his conclusion that the trial was "permeated with perjury of the principal witness produced by the plaintiff, on the witness stand, including what was demonstrated to be the manufacture of critical written material...." The manufacture of written evidence concerned the desk calendar pads of Eric Nietsch, which were submitted to corroborate his testimony regarding sales meetings, telephone calls and the receipt of orders. When the defendant's attorney originally sought discovery of Nietsch's calendar pads, it was reported by the plaintiff that they could not be located. Suddenly, after the first day of the original trial of this matter, after the trial court expressed its skepticism of Nietsch's testimony, the pads were discovered just a few feet from Nietsch's desk at Argo. The appellant insists that the trial judge committed a "devastating and unequivocal error" in concluding that Nietsch fabricated this evidence.

Argo claims that the trial judge concluded that Nietsch had back-dated the calendar pads with information which the trial judge believed Nietsch could not have possibly possessed on the date in question, May 14, 1980. In his memorandum of decision, the trial judge found that while Nietsch testified that he made entries on his calendar pad for May 14, 1980, as a result of a phone call on that date from Mercanti of Camar, recording the receipt of an order placed on that date, the order in fact was not actually placed until a later date. While Argo asserts that an inter-office memorandum of the purchase of the IGS proves that the purchase order was placed on May 14, 1980, on the contrary,

the memorandum, on its face, refutes Argo's contention. The May 19, 1980, memorandum, from Kumar of Trinidad Shipping, reveals that the order had not yet been placed on that date, but was "to be issued shortly" and the price quotation was to be adjusted pending the results of a design study then being conducted.

Further proof of the fabrication of the desk calendar pads, and Nietsch's lack of credibility as a witness, is to be found in the sudden and strange surfacing of the calendar pads, as well as in the inconsistency of the calendar pads with other contemporaneous Argo documents.[2] It is especially revealing that the calendar pads conflict with a May 20, 1980 entry on Argo's sales ledger. Price information concerning the order in question, which was precisely recorded in the May 14, 1980 calendar pad, was omitted as unknown in the May 20, 1980 sales ledger entry. The sales ledger is an especially reliable piece of evidence since it could not be readily altered because it contained line by line entries made by several different people.

■ In reviewing factual findings of a district court, the Supreme Court has stated that:

> [T]he Court of Appeals [is] bound by the "clearly erroneous" standard of Rule 52(a), Federal Rules of Civil Procedure. That Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence. Because of the deference due the trial judge, unless an appellate court is left with the "definite and firm conviction that a mistake has been committed," it must accept the trial court's findings. (citations omitted)

*Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). After a thorough review of the record before us, including a careful reading of the entire trial transcript and an examination of all exhibits, we are firmly convinced that the trial judge did not err in his assessment of the credibility of the plaintiff's principal witness.[3]

II. *Alleged Errors Of Law*

The appellant alleges that the trial court committed two errors of law. Argo first asserts that the district court did not properly apply the law of contract formation to the proposed Distributor Agreement. The appellant further argues that the trial judge incorrectly applied New York agency law to this case.

A. *Distributor Agreement*

The district court determined that the Distributor Agreement, as modified and signed by Camar, constituted a counteroffer which was never accepted by Argo. The appellant insists that the trial judge erred in dismissing the significance of the Distributor Agreement, which it contends demonstrated Camar's intention to grant Argo an exclusive agency. In this appeal, and throughout the trial, Argo has maintained that it had an oral agreement with Camar, pursuant to which Argo had been granted an exclusive sales agency which entitled it to a ten per cent commission on all sales made in its territory regardless of whether or not Argo had procured those sales. Argo claims that the Distributor Agreement reflected this oral agreement and that its case was prejudiced by the trial court's erroneous legal conclusion that the agreement had no significance.

The appellant argues that its failure to sign the agreement does not prevent it from recovering under its terms, that courts have allowed parties to sue to enforce contracts although they have not set their hand to the actual document. However, those cases in which courts have en-

---

**2.** The calendar pads were found in a cabinet, used by Nietsch while he was employed at Argo, which was located 15 to 20 feet from his office.

**3.** Nietsch testified on cross-examination that he had a financial stake in the outcome of the trial.

Specifically, he was to receive 10% of the total award, if any, minus all expenses incurred during the suit, or not less than 5% regardless of the expenses.

forced contracts against a signatory, in favor of a non-signing party, have involved instances where the non-signing party "has accepted [the] written agreement and has acted upon it". *Dreyfus & Co. v. Maresca*, 224 N.Y.S.2d 813, 814 (Sup.Ct., N.Y.Co. 1961). Here, admittedly, major differences existed between Argo and Camar concerning the Distributor Agreement. First and foremost of these was the disagreement between the parties as to whether the relationship to be created was to be a sales agency, which Argo came to desire, or a distributor relationship, as was Camar's expectation. Additional elements of the agreement which presented bones of contention concerned the territory covered by the agreement and terms of payment. It is clear that the plaintiff-appellant did not accept the terms of the written agreement, nor did it act on those terms so as to entitle it to enforce the contract against the defendant-appellee.

■ Accordingly, we find that the trial judge did not err in holding that there was no agreement between the parties manifested in the Distributor Agreement and that the signed Distributor Agreement was merely a counteroffer by the defendant which was never accepted by the plaintiff.

## B. *Earning Of Commissions*

After carefully weighing all of the evidence in the case, the trial judge concluded that Camar, and not Argo, was the producing cause of the IGS sales at issue in this case and, therefore, Argo was not entitled to any sales commissions under New York agency law. The appellant claims that this conclusion by the trial judge was founded upon a misapprehension of the general rule governing the earning of commissions. Argo insists that the test of whether it earned any commissions is "whether Argo brought Camar and its customers together in an amicable frame of mind and otherwise facilitated the sales in issue." Argo also alleges that the district court erred in not finding that it was entitled to commissions under the theories of quasi-contract or quantum meruit.

■ Under New York law, an agent is entitled to a commission when he brings "the minds of the parties together, in that he has procured a buyer ready, willing and able, to purchase on the seller's terms and conditions," *Trihy v. Belsha*, 52 Misc.2d 590, 276 N.Y.S.2d 313, (D.C.Suf.Cty.1966). In order for an agent to be considered the procuring cause, the New York Court of Appeals has required "that there must be a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation." *Greene v. Hellman*, 51 N.Y.2d 197, 206, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980).

■ It is evident from his opinion that the trial judge understood and correctly applied New York law with respect to commissions. The district judge found that "Argo did not initiate, nor was it the procuring cause, wholly or even partly, of any of the ... sale transactions" in issue. His denial of commissions on that basis was proper under New York agency law.

■ As regards the appellant's contention that the court below erred in not finding that Argo was entitled to commissions under either a quantum meruit or a quasi-contract analysis, the trial court found that Argo did not have "expressly or by implication, any reasonable expectancy flowing from any act or agreement of Camar, to receive compensation or commissions on the [IGS sales] transactions." In order to establish a right to compensation under a theory of quantum meruit or quasi-contract, one must establish that he had a reasonable expectancy of receiving such compensation. Here, the trial judge found that the appellant lacked such a reasonable expectancy and, hence, under New York law is not entitled to an award of commissions based upon a quasi-contract or quantum meruit theory.

## III. *The Trial Court's Factual Findings Regarding The Agreement Between The Parties And the Sales Efforts Expended By Argo*

■ The appellant first argues that the trial court erred in its findings concerning

the agreement between the parties. Argo claims that the court below erred in not finding that Argo was retained by Camar as an exclusive sales agent entitled to a ten per cent commission on all sales of Camar IGS in the United States. The appellant asserts that this error was the result of the trial court's rejection of Eric Nietsch's testimony. However, for the reasons set forth above, we have concluded that the district court did not err in finding that Nietsch's testimony was unworthy of belief. Accordingly, the trial judge was entitled to exercise his discretion and accept as true Mercanti's testimony concerning the nature of the agreement between the parties. It is significant to note that by a letter dated as late in the negotiation process as October 6, 1980, Argo solicited Camar's permission to allow its own independent engineering consultant to review the design and engineering of Camar's IGS.[4] Such a request would be more likely to have come from a distributor, worried about its potential products liability, than from an agent.

The appellant also alleges that the trial court was mistaken in its findings regarding the sales efforts expended by Argo and argues that the district court erred in failing to find that Argo was the procurring cause of the sales in issue. To determine the merit of this assertion, we shall examine each sale separately.

■ In the fourth claim of its complaint, the plaintiff asserted that it obtained orders for defendant's IGS from Trinidad Corporation. The trial court determined that "Argo did not produce or motivate or generate a chain of circumstances leading to a sale by Camar to Trinidad." In making this finding, the trial court appears to have relied extensively on the deposition testimony of Vidor Kumar, the manager of engineering for Trinidad. Kumar's statements, which conflict with those of

Nietsch, indicate that Argo had not communicated with Trinidad until very late in the sales process and that the actual selling of Camar's IGS to Trinidad was effectuated by Mercanti himself, an officer of Camar. In light of the credibility of this neutral deponent's (i.e. Kumar's) testimony and the demonstrated untrustworthiness of Nietsch's contrary version of the facts, the trial judge's finding is certainly not clearly erroneous.

The plaintiff's sixth cause of action concerned Argo's claim for a commission for the sale of an IGS to the LACONIAN. Argo insists that the fact that it was responsible for informing Camar of the LACONIAN'S need for an IGS and the fact that it arranged for the vessel's vice president and one of its principals to visit Camar's plant, make clear its entitlement to a commission for the IGS sold to the LACONIAN. However, the trial court found that as the buyer was from London, England and the sale was made overseas, and not in the United States, there was no applicable agreement which could have remotely covered this sale.

Even if we were to decide not to go along with the trial court's conclusion that the sale overseas prevented the plaintiff from asserting a right to a commission (and we do so merely for the sake of argument), the evidence established that the sale of the IGS to Peninsular Maritime (owners of the LACONIAN) was the result of Mercanti's endeavors in London to persuade Peninsular to purchase Camar's IGS, instead of that of a competitor whose IGS Peninsular had, tentatively, already committed itself to purchase. While Nietsch of Argo, at one point, had contacted the captain of the LACONIAN and, on another occasion, met with one of its directors, the credible evidence showed that Peninsular Maritime first approached Camar regarding its IGS.

---

**4.** In its October 6, 1980 letter to Camar, Argo stated "as the *future* sales representative for the inert gas system" and conveyed its desire "to have its independent engineering consultant review the design, engineering, and manufacturing parameters relative to compliance with the latest international regulations on inert gas systems for tank vessels adopted in November 1979 by the assembly of the Intergovernmental Maritime Consultative Organization (IMCO)." (emphasis added)

Hence, the trial court was justified in concluding that Argo was neither the originating nor a motivating cause of the IGS sale to the LACONIAN.

The plaintiff's fifth cause of action stated a claim for a commission due on the sale of a Camar IGS for the MANHATTAN. On appeal, Argo asserts that Nietsch's testimony that he arranged meetings with Nealis of the MANHATTAN and Mercanti of Camar, as well as Camar's admission that Argo was its representative in its quotation on the MANHATTAN, demonstrate that Argo procured the MANHATTAN sale. However, the appellant concedes that this conclusion hinges on a finding that Nietsch's testimony was credible. As has already been discussed, we conclude that the trial judge did not err in finding that Nietsch's testimony was not credible. Even more persuasive on this point is the fact that the unbiased testimony of Nealis himself indicated that his decision to purchase Camar's IGS was based upon the fact that he had previously purchased a Camar IGS for another tanker and that he had been satisfied with the product's performance and operation. He further testified that he first contacted Mercanti about obtaining an IGS for the MANHATTAN and that his only contact with Nietsch, or any other employee of Argo, was at a meeting to which Mercanti had brought Nietsch along. Accordingly, we find no error in the district court's determination that Argo was not entitled to a commission on the MANHATTAN IGS sale.

In its seventh cause of action, Argo claimed a commission was due it on the sale of two Camar IGS exhaust fans to Texaco Overseas Tankships (hereinafter "TOT"). The trial judge found that Argo had not obtained the orders for the equipment and held that Argo was not a motivating or producing cause of such sales. Again, the appellant asserts that the district court made an erroneous finding because it improperly disregarded Nietsch's testimony. And, once again, we affirm that the trial judge had properly exercised his discretion when he chose not to believe Nietsch's self-serving version of the facts.

The testimony of Mercanti on this issue was in direct conflict with that of Nietsch. Mercanti testified at trial that TOT initiated contact with Camar and that Camar convinced TOT to purchase the IGS fans from them. Given the questionable veracity of plaintiff's principal witness, there is no clear error in the district court's decision not to believe Nietsch's account of the sale to TOT.

## IV. *The Trial Court's Dismissal Of Plaintiff's Second, Third And Eighth Causes Of Action*

At the close of plaintiff's case, the district court, on motion of the defendant, dismissed the plaintiff's second, third and eighth causes of action on the grounds that the plaintiff had failed to establish a prima facie case for recovery on the claims stated therein.

The plaintiff's eighth cause of action presented a claim for a commission on the sale of a Camar IGS to a vessel known as the FILIKON L. Appellant contends that the only reason why the trial court dismissed this claim was because it was based entirely on the testimony of Nietsch. Argo insists that the trial judge's decision was based on its erroneous view of Nietsch's credibility. What we have already said concerning Nietsch's credibility as a witness need not be repeated yet another time. Suffice it to say that, the district judge did not err in failing to believe Nietsch's testimony that Argo was responsible for this sale.

However, the appellant is wrong when it insinuates that the district judge's dismissal was based solely on his refusal to believe Nietsch. Certain portions of Nietsch's testimony, itself, persuaded the trial court to dismiss the claim. At his deposition, Nietsch did not even know the name of the vessel on which he was claiming a commission; on cross-examination, he admitted that he did not know the registry of the ship or when the IGS sale was made. Furthermore, Nietsch admitted that he did not participate in any of the key negotiations

for this sale. These negotiations took place in Greece. Nietsch did not know who exercised the decision to buy the IGS on behalf of the FILICON L. Based on the evidence before the trial judge, he did not err in dismissing the plaintiff's eighth cause of action.

 In its second cause of action, Argo sought damages which it alleged arose from Camar's failure to deliver and install an IGS on the COVE LEADER within the time specified in the contract of sale. Argo alleged that it incurred additional expenses in attempting to expedite Camar's delivery of the system. However, the plaintiff's own evidence establishes that whatever difficulties were experienced in delivering IGS components to the COVE LEADER were the result of Argo's failure to obtain the down payment at the time the order for the system was placed and by further delaying forwarding of this payment to Camar, despite the fact that Argo knew Camar normally required a six month lead time for the manufacture of an IGS.

It is especially revealing that the sale of the IGS for the COVE LEADER took place under the terms prescribed by the Distributor Agreement which Camar has argued was to govern Camar and Argo's relationship, and not under the agency arrangement which Argo now claims governed their dealings. While Argo claims that this distributorship arrangement was unique to this transaction, we feel that the actions of the parties pursuant to this sale lend additional weight to the trial judge's conclusion that no agency relationship had been created between the parties. Hence, we conclude that the trial court did not commit error by dismissing plaintiff's cause of action.

 In its third cause of action, the plaintiff claimed that Camar's alleged failure to timely perform the COVE LEADER IGS installation caused it to lose the sale of an IGS for the vessel COVE TRADER. The trial court dismissed this claim, pointing out that Argo never placed an order for a Camar IGS for the COVE TRADER. The court below concluded that whatever arrangement Argo had concerning the vessel was eventually cancelled by Cove with Argo's consent.

The above set of facts was confirmed by the testimony of Callichio, Argo's chairman and president. At trial, Callichio admitted that Argo made no effort to enforce the IGS sales contract against Cove Shipping. Accordingly, the district court correctly dismissed plaintiff's third cause of action since Argo either was responsible for, or acquiesced in, any loss of an IGS sale for the COVE TRADER.

## V. Argo's Alleged Violations Of Its Fiduciary Duties To Camar

On this appeal, Camar represents that Argo violated its fiduciary duties to Camar and, consequently, is not entitled to any compensation. Because we have determined that the trial court did not err in denying Argo's claims for commissions, it is not necessary for us to determine whether or not Argo, as an agent, breached its fiduciary duty to Camar by acting against its principal for its own benefit and by releasing confidential information to a competitor in the bidding process.

## VI. The Trial Court's Award Of Sanctions Under Rule 37 Of The Federal Rules Of Civil Procedure

After it had obtained a dismissal of Argo's claims and a judgment on its counterclaim, Camar applied to the district court for the imposition of monetary discovery sanctions of not less than $50,-000.00, pursuant to Rule 37(b)(2) of the Federal Rules Of Civil Procedure. Following a hearing on the matter, the trial judge imposed sanctions upon the plaintiff in the amount of $3,500.00. Argo now appeals this award of sanctions arguing that the discretion of the trial court was rendered "unsound" by its erroneous belief that Nietsch had submitted forged documents. The Appellant further asserts that the five trial exhibits, which the court below concluded had not been produced as required by the defendant's discovery request, were

never specifically requested. Finally, Argo also maintains that expenses should not have been awarded to the defendant because it had failed to produce documents pursuant to plaintiff's demand.

■ The district court concluded that the imposition of sanctions was appropriate in this instance, because it found that the plaintiff had violated its discovery order concerning Nietsch's desk calendar pads. The court below concluded that even if Argo's failure to comply was not willful, but was, instead, a result of its gross or even simple negligence, sanctions may, nevertheless, be imposed. We find that both the facts of this case and the applicable law support the district judge's conclusion. *See Cine Forty-Second Street Theatre v. Allied Artists*, 602 F.2d 1062, 1066 (2d Cir.1979).

■ The award of sanctions under Rule 37 is subject to the sound discretion of the district court. *See National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). It is clear that the plaintiff, without justification, failed to disclose to the defendant material covered by the district court's discovery order and that such nondisclosure caused the defendant to bear costs which would not have been necessary had plaintiff complied with the court's order. Accordingly, the trial court's imposition of monetary sanctions was proper.

## VII. *Request For The Imposition Of Sanctions On Appeal*

■ Camar argues that it is entitled to damages as well as attorney's fees and costs for the appellant's frivolous appeal and misuse of judicial procedure, resulting in needless delay. However, the determination of whether or not to impose such sanctions is reserved to the discretion of this Court. As we do not conclude that Argo's appeal was clearly frivolous, we decline to impose sanctions upon the appellant.

CONCLUSION

For the reasons set forth above, we affirm the decision of the district court in all respects and refuse to impose sanctions on this appeal.

WINTER, Circuit Judge, concurring in part and dissenting in part:

Because I take a different view of the district court's factual findings and of the application of New York law to Argo's efforts with regard to two of the sales in issue, I respectfully dissent. With regard to the remaining sales, I concur in Judge Clarie's opinion.

My disagreement concerns the Trinidad and LACONIAN sales. The majority states that the district court found there was no express agreement between Argo and Camar and therefore the New York law of sales applies. That, however, is a mischaracterization of the findings of the district court. The district court's basis for decision was a finding of an express oral understanding that Camar would pay a commission to Argo only "if Argo sold a system to a purchaser other than itself in a transaction *in which Camar was not called upon to participate ...*" (emphasis supplied). This purported agreement varies radically from the New York law of sales in that commissions are not due to a "procuring cause" if the principal plays any role in the sale. In my view, the district court's finding with regard to the express oral understanding is clearly erroneous, and Argo was the procuring cause of the Trinidad and LACONIAN sales under New York law.

The district court's finding with regard to the supposed oral understanding is clearly erroneous because it is based on a misunderstanding of the proposed distributorship agreement and is not consistent with the conduct of the parties as established in the record. On the basis of Mercanti's testimony, the district court concluded that the parties had agreed "pending the resolution whether Argo would agree to become the purchaser and pay for IGS manufactured by Camar under the Distributor setup that the only basis of allowing any

compensation to Argo would be in such instances in which the procurement of a sale followed the guidelines of the distribution agreement; if Argo sold a system to a purchaser other than itself in a transaction in which Camar was not called upon to participate, Argo would be entitled to a 10% commission." However, this description of the parties' supposed express oral understanding hardly follows the "guidelines of the distribution agreement," which called for a flat 10% commission to Argo on all sales of Camar IGS in the United States, whatever the roles played by Argo or Camar.

Moreover, the existence of such an oral agreement is hardly consistent with Argo's conduct in freely involving Camar in all the proposed sales, an act which, according to the district court, automatically terminated its right to a commission. I cannot agree with the view that Argo eagerly pursued customers for Camar for over two years and expected to receive no compensation whatsoever.

Because Argo and Camar had no express contract, Argo's right to commissions is governed by New York law, which, as the majority points out, recognizes a right to a commission where an agent is the "procuring cause" of a sale—i.e., produces a buyer ready, willing and able to meet the seller's terms. *Nuvest, S.A. v. Gulf & Western Indus.*, 649 F.2d 943, 947 (2d Cir.1981); *Greene v. Hellman*, 51 N.Y.2d 197, 412 N.E.2d 1301, 433 N.Y.S.2d 75 (1980). This does not require that the agent be the "dominant force" in the transaction, *id.* at 206, 412 N.E.2d 1301, 433 N.Y.S.2d 75, but only that its efforts have a direct connection with the success of the sale. Unlike the majority, I cannot conclude that the district court's repetitive incantation of the sentence, "Argo had no participation in the transaction, was not the originating, or a motivating, or a procuring cause of the sale ..." in response to each of Argo's claims, concludes the matter in light of its findings and conclusions viewed as a whole. In applying the New York legal test to the facts, the district court's conclusions were obviously dictated by its erroneous finding that Argo's right to commissions was governed by the supposed oral contract described above.

Turning to the application of the New York test, the testimony of disinterested witnesses demonstrates that Argo provided sufficient services to have earned a commission with regard to at least two of the sales at issue. As to the Trinidad sale, totalling three vessels, it is undisputed that Argo arranged the first meeting between Mr. Whiteside of Sohio (the charterer of the tankers, and the company ultimately responsible for paying for the IGS for two of the three ships) and Mercanti. Moreover, Argo engaged in various follow-up calls and meetings, alone and with Camar. The majority ignores the role that Whiteside and Sohio played in the decision to purchase from Camar by focusing on the fact that Mr. Kumar, an engineering manager of Trinidad Corporation, the owner of the vessels, had no contact with Argo until late in the sales process. However, Kumar testified that he contacted Camar regarding an IGS as a consequence of Whiteside's informed advice. The fact that Argo invested considerable effort in convincing Whiteside to buy from Camar is thus critical. The district court downplayed Argo's role by noting that a Mr. Franklin, at the time an agent for Camar, contacted Whiteside before Mr. Blondeau of Argo. However, Whiteside testified that Franklin merely sent him a brochure and made a few telephone calls without any follow-up meetings taking place. In contrast, Blondeau, with whom Whiteside had frequent business dealings apart from the Camar IGS, came to Whiteside in person and had "several meetings" with him about the Camar IGS, and thereafter arranged for Whiteside to visit the Camar plant and to meet Mercanti. These facts, I believe, clearly establish Argo's right to a commission on the Trinidad sales.

Argo also played a substantial role in the sale of an IGS to the LACONIAN, a foreign ship for which Eagle Ocean Shipping of New York was the United States agent. Captain Goussetis, the vice-president of Eagle, testified in a deposition that Nietsch originally approached him concerning a Camar IGS, and that Goussetis had not previ-

ously heard of Camar or of James Mercanti. Nietsch then caused Camar to send a quotation to Captain Goussetis, who forwarded it to Peninsular Maritime of London, the worldwide agent for the LACONIAN. Mr. Economides, the engineering superintendent of Peninsular, testified that it was because of Mr. Goussetis's recommendation that he decided to consider purchasing a Camar IGS, whereas previously he had considered purchasing only from non-U.S. companies. The majority stresses the fact that the LACONIAN was not a United States flag vessel, and therefore was not covered by any applicable agreement between Argo and Camar. Because there was no agreement at all between Argo and Camar, however, the parties' negotiations over sales territories are completely irrelevant. The only relevant inquiry is whether Argo was a "procuring cause" of the sale. Again, the undisputed facts seem sufficient to entitle Argo to a commission.

Regarding the remainder of the sales, there is insufficient testimony from disinterested witnesses to determine the extent of Argo's participation. I concur, therefore, in affirming the district court's holding that Argo failed to meet the burden of proving its entitlement to commissions on these sales.