**David B. KREISS and Gregory M. Shelton, Plaintiffs,**

v.

**McCOWN DE LEEUW & CO. and Outsourcing Solutions, Inc, Defendants.**

**No. 97 Civ. 09448 GEL.**

United States District Court, S.D. New York.

Jan. 19, 2001.

Richard M. Zaroff, Wormser, Kiely, Galef & Jacobs, LLP, New York City, for plaintiffs.

Glen M. Kurtz, White & Case, LLP, New York City (Daniel P. Goldberg, of counsel), for defendants.

### OPINION AND ORDER

LYNCH, District Judge.

This diversity case, acknowledged by the parties to be governed by New York law, arises from the founding of a company, Outsourcing Solutions, Inc. ("OSI"). OSI, one of the defendants in this action, is engaged in the acquisition of debt-portfolio purchasing and contingent-fee collection companies. The other defendant in this action, McCown De Leeuw & Co. ("MDC") (collectively with OSI, "Defendants"), is a private venture capital firm that provided a substantial portion of the initial financing for OSI. Plaintiffs David Kreiss and Gregory Shelton allege that they brought the business plan underlying OSI to MDC to obtain financing. Plaintiffs and MDC subsequently formed OSI as the vehicle to carry out the business plan, and Plaintiffs became officers of that company. Differences between the parties apparently de-

veloped shortly after the formation of OSI, leading Kreiss and Shelton to resign.

Nearly a year after their resignations, Plaintiffs commenced this action for breach of contract and *quantum meruit,* claiming that they are entitled to more compensation than they received for services they provided to the Defendants. Specifically, Plaintiffs contest the calculation of the price at which OSI purported to reacquire certain stock options that had been granted to them, and argue that they were entitled, either by contract or in *quantum meruit,* to additional compensation equivalent to a direct grant of an equity position in OSI.

In an earlier opinion, this Court dismissed one of Plaintiffs' four primary causes of action, but denied Defendants' motion to dismiss the other claims. *See Kreiss v.McCown De Leeuw & Co.,* 37 F.Supp.2d 294 (S.D.N.Y.1999) (Ward, J.). Defendants now move for summary judgment on the remaining causes of action. This court having heard oral arguments from both parties on November 6, 2000, and having carefully reviewed the submissions of the parties, Defendants' motion for summary judgment is GRANTED.

### Facts [1]

Plaintiffs are sophisticated businessmen with significant experience in the debt management and collection industry. (*See* Kreiss Decl. Ex. B at 2–5.) At some point prior to 1995, they devised a business model based on acquiring companies with debt-portfolio purchasing capabilities and companies with contingent-fee collection capabilities. Plaintiffs believed that by consolidating such companies into a single entity they could significantly increase profit margins. (*See* Kreiss Decl. Ex. B. at 9–

11.) Their ideas were incorporated into a business plan which they used to obtain financing for the project.[2]

One of the investors Plaintiffs contacted was MDC. Following their introduction in March 1995, Plaintiffs and MDC agreed in principle to organize a company that would implement the acquisition strategy outlined in Plaintiffs' business plan. The proposed terms of the deal were set out in a document entitled "Project Recover Equity Investment Term Sheet" (the "Term Sheet"), which was executed on March 30, 1995. (*See* King Decl. Ex. A.) The present dispute in large measure concerns what the parties believed the terms of the deal to be.

The Term Sheet provides for the formation of OSI with initial capital provided by MDC and Plaintiffs in exchange for equity representing their respective contributions. MDC provided the lion's share of OSI's initial capital, contributing nearly $15 million. Kreiss and Shelton contributed an aggregate of $150,000 to OSI. In exchange they received 8000 and 4000 shares of common stock, respectively. In addition to owning stock in the newly formed entity, Kreiss was to serve as President and CEO and Shelton as Executive Vice President of OSI.

By its own terms, the Term Sheet was not a binding contract, but anticipated the creation of additional documents to embody the binding agreement between the parties. However, certain provisions of the Term Sheet governing the salary and benefits to be paid to the Plaintiffs prior to the formation of OSI were specifically identified (in the letter of understanding accompanying the Term Sheet) as enforceable. Under these provisions, Kreiss was

---

1. For the most part, these facts are drawn from those portions of Defendants' statement, pursuant to Local Rule 56.1, of facts contended not to be in dispute, that the Court finds are not substantially disputed by Plaintiffs. Determining which facts Plaintiffs dispute is hampered by Plaintiffs' failure properly to specifically identify "the material facts as to which it is contended there exists a genuine

issue to be tried," as required by Local Rule 56.1

2. Plaintiffs were assisted in soliciting financing by a Georgia investment banking and advisory firm, Resurgens Capital and Investment, Inc.

entitled to receive $16,667.67 per month, and Shelton $10,416.67, for up to six months until the first acquisition. MDC retained the option to terminate this relationship after three months, and if they chose to do so, would be obligated to pay only one additional month's salary to each of the Plaintiffs. (*See* King Decl. Ex. A, at Cover Letter 1.) Upon acquisition of the first target company, Kreiss' base compensation would increase to $300,000 per annum, and he was eligible for a bonus of up to 100% of his base salary subject to meeting performance targets.[3] (*See* King Decl. Ex. J.) It is apparent that Plaintiffs were entitled to, and did in fact, receive substantial compensation for their services.

The Term Sheet contemplated additional compensation in the form of equity and/or options to purchase equity. The precise nature of the equity compensation contemplated in the Term Sheet and the extent to which it was incorporated into the subsequent agreements, or entitles Plaintiffs to further compensation, is the crux of this lawsuit. Some of the key provisions contemplated by the Term Sheet were eventually embodied in several additional documents at issue in this motion for summary judgment. These were the Amended and Restated Stockholders Agreement (the "Stockholders Agreement"), and the Stock Option and Award Plan (the "Stock Plan"), and the respective Stock Option Awards Agreements between OSI and each of the Plaintiffs (collectively, the "Option Agreements"). Taken together, the Stockholders Agreement, the Stock Plan and the Option Agreements set forth a program for the distribution of equity and options to purchase equity in OSI. This program entitled Plaintiffs, in addition to their salaries and bonuses, to option awards and direct grants of equity subject to certain time-vesting and performance-based conditions.

The basis of Plaintiffs' equity participation in OSI was the Stock Plan, adopted by OSI's Board of Directors in 1995, which provided eligible employees with the "opportunity to acquire common stock through the grant of options, stock appreciation rights in tandem with such options [and] the award of restricted stock." (King Decl. Ex. F at 1.) Any awards of options or equity under the Stock Plan were to be evidenced by agreements, the form of which were to be prescribed by the Board. The Board apparently prescribed two form agreements governing, respectively, time-vesting options (the "A" Option Agreements) and performance-based options (the "B" Option Agreements), both of which were put in place with respect to Kreiss and Shelton. Under the "A" Option Agreements, Kreiss and Shelton were eligible to receive as compensation options to purchase up to 32,262 and 13,826 shares respectively of common equity in OSI at $12.50 per share—these options would vest over time. (*See* King Decl. Exs. B & C.) Under the "B" Option Agreements, Kreiss and Shelton were eligible to receive options to purchase up to 25,348 and 32,262 shares respectively (also at $12.50)—these options vested pursuant to performance-based criteria set forth in the agreements. (*See* Kurtz Decl. Exs. P & Q.) In addition, the Stock Plan provided for discretionary grants of restricted stock to qualified employees "in addition to or in lieu of" the option grants, under terms and conditions to be set by the Board. (King Decl. Ex. F ¶ 7(a).) Any grants of options or equity were also subject to the conditions of the Stockholders Agreement which, significantly, contained a repurchase provision entitling OSI to repurchase the options granted to Plaintiffs within 60 days after the termination of their employment. (*See* King Decl. Ex. E § 2.5(a).) The repurchase price depended upon whether the Plaintiffs resigned with or without "good cause." (*See id.* §§ 2.5(c), (d).)

---

**3.** The record does not indicate whether similar salary modifications were provided for Shelton, and it does not appear that any bonuses were paid to either Kreiss or Shelton. At any rate, Plaintiffs seek no damages based on failure to pay salaries or bonuses.

By September 1995, the documents at issue had been executed and OSI began acquiring the target companies projected by the business plan. The Plaintiffs claim that their expertise and experience in the industry was crucial to the identification and acquisition of several companies. Apparently, this string of successful acquisitions placed OSI in a favorable financial position, permitting it to float a $100 million bond offering. In the summer of 1996, the proceeds from this bond offering were used to acquire Payco, one of the largest companies acquired by OSI to that date. Despite his position as CEO and President, Kreiss was excluded from participating in the Payco acquisition, and was subsequently informed by the Board, controlled by MDC, that it would install a new CEO once the deal closed. Timothy Beffa eventually replaced Kreiss as the CEO of OSI, apparently leading to a reduction of the Plaintiffs' duties.[4] Consequently, Kreiss and Shelton submitted written resignations on October 22, 1996. Plaintiffs apparently went on to found a competing business venture[5] and MDC eventually sold its stake in OSI at a significant profit. Upon Plaintiffs' resignation, OSI purported to reacquire the options granted to Plaintiffs under the Option Agreements, at a cost of zero dollars, pursuant to the repurchase provisions of the Stockholders Agreement. (*See* King Decl. Exs. I & J.) Accordingly, when Plaintiffs attempted to exercise the options about a month later, OSI refused to recognize them. This lawsuit followed.

## Procedural History

The Complaint in this action was filed in October 1997, approximately one year after OSI prevented Plaintiffs from exercising their options. The Complaint alleged four primary causes of action which can usefully be considered under two headings: the option claims and the equity claims.[6]

The first two causes of action, one for each Plaintiff, charged that Defendants breached the Option Agreements by refusing to honor Plaintiffs' options. Plaintiffs do not contest Defendants' right to repurchase the options under the provisions of the Stockholders Agreement, but argue that Defendants failed to properly abide by those provisions. Specifically, Plaintiffs contest the repurchase price of zero dollars, at which Defendants purported to reacquire the options in question.

The second two claims, brought on behalf of both Plaintiffs, sought damages for breach of contract and *quantum meruit*. Each of these claims was based on Defendants' alleged failure to convey to Plaintiffs an equity grant purportedly contemplated by the parties in consideration of Plaintiffs' efforts on behalf of MDC and OSI. Plaintiffs claimed that the Term Sheet was an enforceable contract, which Defendants breached by failing to give each of them direct grants of equity separate from, and in addition to, both the options (and/or any stock purchased pursuant to the options) and the equity that they received in exchange for their initial capital contributions. Alternatively, Plaintiffs sought recovery for the value of that equity in *quantum meruit*.

Defendants flatly deny Plaintiffs' entitlement to any compensation apart from the salaries they received and the repurchased options. They contend that the options were legitimately repurchased for a price of zero dollars under the formula explicitly set out in § 2.5 of the Stockholders Agree-

---

4. The parties dispute exactly what happened and whether Plaintiffs' exclusion from the Payco deal amounted to a reduction of authority or not. But as the discussion below reveals, this dispute is not material for purposes of this summary judgment motion.

5. No documentary evidence presented in the motion papers confirms this fact, which is asserted by Defendants and not contested by Plaintiffs.

6. Plaintiff asserts a fifth cause of action for attorneys fees if they prevail in this action, pursuant to § 5.7(d) of the Stockholders Agreement. Defendants counterclaim under the same provision if they prevail. (*See* § III, *infra.*)

ment. As for the claimed direct equity grant, they contend that the Term Sheet and the various agreements created pursuant to it comprehensively set forth the compensation to be provided to Plaintiffs, and that none of these documents contemplates any such direct grant of equity.

Defendants moved to dismiss the Complaint on June 15, 1998, on the grounds that (1) they had properly exercised their rights under the repurchase provisions of the Stockholders Agreement, (2) the Term Sheet was not an enforceable contract, and (3) *quantum meruit* was precluded, *inter alia*, by the existence of contracts governing the granting of options and equity and by the absence of a reasonable expectation by Plaintiffs about receiving such equity.

Judge Ward refused to dismiss the first two claims relating to breach of the Option Agreements, holding that "whether Defendants effectively repurchased Plaintiffs' stock options in accordance with the Stockholders Agreement . . . is [an issue] of fact not properly resolved on a motion to dismiss." *Id.* at 298. However, he dismissed Plaintiffs' claim for equity based on Defendants' alleged breach of the Term Sheet, holding that the "unambiguous expression of the parties' intent not to be bound [except by formal agreement] establishes that, as a matter of law, the Term Sheet was not binding." *Kreiss v. McCown De Leeuw & Co.*, 37 F.Supp.2d 294, 301 (S.D.N.Y.1999).

Judge Ward also granted in part and denied in part Defendants' motion to dismiss the *quantum meruit* claim. Plaintiffs sought recovery in *quantum meruit* for both the value of options contemplated in the Term Sheet but not granted in the Option Agreements and for the value of the equity purportedly contemplated by parties for Plaintiffs' role as founders of OSI. Judge Ward granted Defendants' motion to dismiss the *quantum meruit* claim to the extent that Plaintiffs had sought compensation for the value of the options contemplated in the Term Sheet but not realized by the Option Agreements. He

found that Plaintiffs' *quantum meruit* claim for these additional options was barred under New York law because the Option Agreements covered the same subject matter at issue, namely the granting of options to the Plaintiffs.

At the same time, he denied Defendants' motion to dismiss the *quantum meruit* claim for the value of a direct grant of equity. Judge Ward reasoned that the Term Sheet appeared to contemplate a direct grant of equity apart from options, and he cited the relevant provision in support of this position in the following manner.

> At the time of the initial Acquisition, Mr. Kreiss and Mr. Shelton will be entitled to receive 5.0% and 1.5%, respectively, of the common equity of the Company . . . .

*Id.* at 296. Judge Ward ruled that, unlike Plaintiffs' claim for additional options, no explicit contract governed direct grants of equity to Plaintiffs. He therefore concluded that, after proper development of the factual record, Plaintiffs might be able to recover in *quantum meruit* for "other compensation promised in the Term Sheet such as equity, since no express contract exists on this subject." *Id.* at 302.

Following Judge Ward's decision, Defendants moved for reconsideration, arguing that he had misconstrued the pertinent clause in the Term Sheet. Defendants apparently argued then, as they do now, that the pertinent clause reads in full:

> At the time of the initial Acquisition, Mr. Kreiss and Mr. Shelton will be entitled to receive 5.0% and 1.5%, respectively, of the common equity of the Company *under this program.*

(King Decl. Ex A, at Term Sheet 2) (emphasis added). They insisted that the omitted phrase "under this program" referred to a plan of equity participation (described earlier in the same paragraph), which provided for option awards, not direct grants of equity. Defendants maintained that, read in the appropriate con-

text, this reference to "common equity" was actually a reference to options that Plaintiffs would be entitled to receive under the proposed program. Thus, they claimed, Judge Ward was mistaken in finding that the Term Sheet contemplated direct grants of equity apart from options. Defendants concluded that since the Term Sheet did not contemplate a grant of equity apart from options, there remained no basis for recovery in *quantum meruit*. Judge Ward denied Defendants' motion without prejudice to its renewal in connection with Defendants' anticipated summary judgment motion.[7]

Discovery in this action having been concluded, Defendants now move for summary judgment on all of the remaining claims and renew their previous motion for reconsideration.

## Analysis

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(b). The party opposing summary judgment "may not rest upon mere allegations or denials," rather it must "set forth specific facts showing that there is a genuine issue for trial." *Id.* 56(e). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Lib-*

*erty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. Breach of the Option Agreements

Judge Ward denied Defendants' motion to dismiss Plaintiffs' first two claims for breach of the Option Agreements on the pleadings. Following full discovery, it is now apparent that there are no material issues of fact relating to this claim, and summary judgment is appropriate.

### A. Defendant MDC

In their Complaint, Plaintiffs assert claims for breach of the Option Agreements against both OSI and MDC. Even if OSI did breach the Option Agreements by refusing to permit Plaintiff to exercise their options, MDC cannot be held liable for that breach. It is undisputed that Plaintiffs' rights to stock options are based on the Option Agreements, and Plaintiffs' concede that only OSI, not MDC, is a party to that contract. (*See* Pl. Mem. Opp. at 11 n. 6.) Since MDC cannot be sued for breach of a contract to which it is not a party, these claims must be dismissed as against MDC.

### B. Defendant OSI

OSI argues that Plaintiffs' resignations in October 1996 triggered its right, under § 2.5 of the Stockholders Agreement, to repurchase the disputed options. The repurchase provision gave OSI the right to repurchase the options owned by Plaintiffs within 60 days after the termination of employment. The repurchase price is either the greater or lesser (depending on whether Plaintiffs resigned with or without good cause) of two values: (1) the price originally paid for the options and (2) the book value of the options.[8] It is undisput-

---

7. Judge Ward made his ruling during a telephone conference between the parties following the decision. (*See* Kurtz Decl. Ex R.) The only evidence of what transpired during that telephone conference is a letter written by Defendants to memorialize that conversation, assertedly at Judge Ward's request. (*See id.;*

Transcript of 11/6/00 Oral Argument (hereinafter "Tr."), at 45–6.) Plaintiffs have never objected or responded to Defendants' characterization of Judge Ward's ruling.

8. The book value of the options is defined as: $12.50 +/change in stockholder's equity—exercise price of the options ($12.50 in this

ed that Plaintiffs received the options as compensation and thus paid nothing for them. Value (1) is therefore zero. OSI introduced evidence concerning the book value of the options in the form of a detailed analysis by Daniel Pijut, the Corporate Controller and Vice President of OSI and a qualified CPA. Pijut's analysis shows that the book value of the stock (and thereby of the options based on that value) steadily declined over the period identified in the Stockholders Agreement, because no capital was added to the firm and the firm operated at a loss during that period. Since value (2) was thus a negative number, neither the greater nor the lesser of the two identified values is greater than zero. OSI argues that it was therefore entitled to repurchase the options, and did in fact repurchase them, at no cost, regardless of whether the Plaintiffs resigned with or without good reason.

There is no dispute that upon Plaintiffs' resignation from OSI, OSI purported to exercise its rights under the agreement to repurchase Plaintiffs' stock options, claiming that the agreement entitled it to repurchase the options for a price of zero dollars. (*See* King Decl. Exs. I & J.) The only disagreements between the parties are legal ones regarding the price properly to be paid for the options under the contract terms, and the enforceability of those terms. These are issues which may be resolved on summary judgment. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989)(contract interpretation is an issue of law capable of resolution on summary judgment).

Plaintiffs attempt to dispute this analysis in two ways, one factual and one legal. First, they seek to discredit Mr. Pijut's

calculation as a matter of fact by quibbling with certain aspects of the analysis and by noting that the market value of OSI, as indicated by MDC's later sale of its interest, apparently increased substantially during the period in question. These efforts to create a genuine issue of fact concerning the book value of OSI shares on the date of Plaintiffs' resignation in October 1996 are unavailing. Plaintiffs have not provided a competing analysis of the book value question. Their various objections to Mr. Pijut's opinion, even if given full credit, only alter the extent of decline in book value in the relevant period. Thus, their objections do not alter the conclusion that during the relevant period the change in value was consistently negative.

Nor is evidence that outside parties were prepared to pay a hefty price for OSI relevant to the dispute at hand. Book value and market value are two distinct and well-understood concepts. Had the parties chosen to base the repurchase price on market value, they could have done so, but they did not, choosing instead to rely on the quite different concept of book value. There is nothing remarkable, particularly in light of recent stock market history, about a company's stock selling at a premium in the market place despite the fact that the company has continually operated at a loss. The alleged increase in OSI's market value casts no doubt on the essentially technical analysis of book value, which Plaintiffs conspicuously fail to contest in any meaningful way.[9]

Second, Plaintiffs claim that, as a matter of law, the repurchase agreement should be held unenforceable, or should be

case). (King Decl. Ex. D. § 2.5.) Under this formula, the book value of the options in this case turns out to be the net change in stockholder equity.

9. Plaintiff's failure to call into question Mr. Pijut's book value calculations also renders immaterial any factual dispute over whether or not Plaintiffs were "demoted" and thus resigned for good cause. As noted above, the

Stockholders Agreement stipulates alternative formulas for calculating the repurchase price for unexercised stock options held by departing OSI employees, depending on the circumstances of the termination of employment. Since OSI's stock never achieved a positive change in stockholder's equity, however, neither of the alternative calculations yields a repurchase price above zero.

interpreted in some way other than according to its clear terms, because the agreement literally read works a "forfeiture" of the options earned by Kreiss and Shelton—a result that, according to Plaintiffs, is abhorrent to New York law (which governs the contract, and must be followed by the Court in this diversity action). (*See* Pl. Mem. Opp. at 3 (citing *Hoosier Energy Rural Elec. Coop. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1320 (7th Cir. 1994).)) Plaintiffs' argument finds no support in New York case law.

■ Cases stating New York's anti-forfeiture principle use it as an interpretive device, not as a rule that voids clear agreements intended by the parties. *See Hoosier*, 34 F.3d at 1320 (applying New York law); *see also Trustco Bank New York v. 37 Clark St., Inc.*, 157 Misc.2d 843, 599 N.Y.S.2d 404, 405 ("Though the law does not favor forfeiture, courts will enforce it if the parties agreed to it"); *220 West 42 Assocs. v. Ronbet Newmark Co.*, 84 Misc.2d 259, 375 N.Y.S.2d 255 (1975) ("[C]ourts should *interpret* contracts to avoid [forfeiture]") (emphasis added). While New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture, a contract is only ambiguous if it is susceptible to two equally plausible interpretations. *See Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 204 (2d Cir.1998).

Here, there is no ambiguity to resolve. The Stockholders Agreement grants a repurchase right to OSI, and defines a precise mathematical formula for determining the repurchase price. Plaintiffs do not even attempt to offer an alternative, more favorable interpretation to which the contract language may be susceptible. Instead they argue that they "were not aware and certainly did not intend (nor could or would anyone so agree) that the options for which they had negotiated and which were presented to them as part of their compensation package would eventually have no value whatsoever." (Pl. Mem. Opp. at 4.) But this argument does not

render the language ambiguous. The fact that one party did not subjectively intend an outcome that a contract plainly requires does not render the contract ambiguous; it merely means that the party struck a disadvantageous bargain. The contract is clear and unambiguous, so even if it works a forfeiture, New York law does not require dishonoring the parties' clear agreement.

In any event, it is by no means clear that the agreement works a forfeiture within the meaning of the cited precedents. The forfeiture cases essentially disfavor complete loss of the benefit of the bargain by a party who has substantially performed its obligations, merely because of technical non-compliance with particular contractual provisions. *See Hoosier*, 34 F.3d at 1320. Plaintiffs here, however, are not being punished for such a technical violation or deprived of promised compensation despite substantial performance. The options were granted to Plaintiffs as promised. If the options were valuable, Plaintiffs had the right to exercise them at any time before resigning. It was perfectly reasonable for the parties to provide that unexercised stock options could be reclaimed when the party to whom they were given left employment, and to set a price in advance for that repurchase. The recipient of stock options takes a familiar kind of gamble: at some future point, the options may lose value, because the option price becomes higher than the market price, or because the holder cannot afford to exercise the option. Under the terms of this agreement, Plaintiffs also took the further risk that the repurchase price could be either advantageous or disadvantageous depending on changes in the capitalization or profitability of the company. None of these risks are so unusual or outlandish that a Court can conclude that the clear language of the agreement does not mean what it manifestly says. As events developed, Plaintiffs chose not to exercise the options before resigning, and the price established by the contract—

which by its terms *could* have been something other than zero—turned out to be zero, a possibility clearly contemplated by the agreement. This is not a forfeiture.

To summarize, the historical facts here are undisputed: Plaintiffs were given the options that they were entitled to under the contract. The contract unambiguously permitted OSI to repurchase the options at a price set according to a formula provided in the contract. OSI exercised its right to do so. There is no genuine issue of fact concerning the calculation of the price under the contract, and no legal reason why the repurchase agreement should not be enforced according to its terms. Accordingly, there was no breach by OSI of the contractual provisions relating to options.

## II. Quantum Meruit

■ Plaintiffs' remaining claim seeks recovery in *quantum meruit* for the reasonable value of services allegedly performed for the benefit of the Defendants. In order to recover for the value of these purportedly uncompensated services, the Plaintiffs must show "the performance of the services in good faith; the acceptance of the services by the person to whom they are rendered; an expectation of compensation therefor; and the reasonable value of the services." *See Freedman v. Pearlman,* 271 A.D.2d 301, 706 N.Y.S.2d 405, 408 (1st Dep't 2000). The mere expectation of compensation by a party is not sufficient to merit recovery. Rather there must be a "reasonable expectancy of receiving such compensation." *Argo Marine Systems, Inc. v. Camar Corp.,* 755 F.2d 1006, 1011 (2d Cir.1985). *See also Int'l Paper Co. v. Suwyn,* 978 F.Supp. 506, 513 (S.D.N.Y.1997); *American–European Art*

Assocs., Inc. v. Trend Galleries, Inc.,* 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1st Dep't 1996).

■ The Complaint originally sought recovery in *quantum meruit* for the value of both equity and options that were outlined in the Term Sheet but not granted by the Option Agreements.[10] As Judge Ward noted in the earlier decision partially granting Defendants' motion to dismiss, New York law does not permit recovery in *quantum meruit* where an express agreement covers the same subject matter involved. *See GSGSB, Inc. v. New York Yankees,* 862 F.Supp. 1160, 1170 n. 8 (S.D.N.Y.1994); *Julien J. Studley, Inc. v. New York News, Inc.,* 70 N.Y.2d 628, 629, 518 N.Y.S.2d 779, 512 N.E.2d 300 (1987); *Miller,* 218 N.Y. at 406–07, 113 N.E. 337. *See also Clark–Fitzpatrick,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (quasicontract); *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42 (2d Cir.1988) (same). Judge Ward found that the Term Sheet did contemplate grants of both options and equity to the Plaintiffs, but that the Option Agreements were express agreements clearly governing the granting of any options contemplated in the Term Sheet. Consequently, he concluded that even if, as the Plaintiffs alleged, the option awards received by the Plaintiffs were less than what had originally been proposed in the Term Sheet, they could not recover in *quantum meruit* for the reasonable value of these additional options. On the other hand, Judge Ward found that there was no analogous agreement that governed direct grants of equity to the Plaintiffs, and refused to dismiss their *quantum meruit* claim for the reasonable value of equity set out in the Term Sheet.

**10.** During oral argument, Plaintiffs' counsel pointed out that the *quantum meruit* claim does not seek equity *per se,* but reasonable compensation for the services provided, for which the equity interest reserved to the Plaintiffs in the Term Sheet is a reasonable benchmark. (*See* Tr. 9, 32.) The point is well taken, and all references to equity in this opinion should be regarded as shorthand for equity or other equivalent compensation. Nevertheless, since the claim is essentially that Plaintiffs reasonably expected an award of equity that was not provided, it is clear and convenient to refer to the claim as one for equity.

Defendants moved for reconsideration solely with regards to the *quantum meruit* claim for equity. At that time, they contested Judge Ward's reading of the Term Sheet, arguing that the proposed terms contained therein did not contemplate a grant of equity apart from options. Judge Ward denied Defendants' motion for reconsideration without prejudice to its renewal in connection with this summary judgment motion. Although Judge Ward did not explicitly set forth his reasoning, the basis of his conclusion is clear in retrospect. Even if Defendants are correct that the Term Sheet did not contemplate a separate grant of equity apart from options, whether or not, as Plaintiffs alleged, they had a reasonable expectation of equity participation that was not fully captured by the provisions in the Term Sheet undoubtedly required further development of the factual record through discovery.

In their present motion for summary judgment, Defendants renew the arguments made in their motion for reconsideration, and make several new ones. One of those new arguments can be quickly disposed of. Defendants cite a number of cases standing for the proposition that salaried employees may not seek additional compensation in *quantum meruit* for additional services performed in conjunction with their employment unless "the allegedly uncompensated duties (performed) were distinct in character from those duties for which the plaintiff was compensated." *La-Jaunie v. DaGrossa*, 159 A.D.2d 349, 552 N.Y.S.2d 628, 629 (1st Dep't 1990). The cases cited are, for the most part, unhelpful in resolving the issue before this court, since Plaintiffs clearly performed in two distinct capacities with respect to the venture in controversy.[11] Plaintiffs were unquestionably executive-level employees charged with the task of identifying acquisition targets for and managing the daily business affairs of OSI. However, Plaintiffs do not seek compensation for additional services performed as executives of OSI. While Plaintiffs characterize their claim as one for uncompensated "services" provided for the benefit of the Defendants, the services to which they refer were performed well before Plaintiff ever entered into a business relationship with MDC, or began receiving a salary from either MDC or OSI.[12] The services in question were per-

---

**11.** Cases applying the rule barring recovery in *quantum meruit* for further compensation are inapposite because they involve ongoing employment relationships in which an employee seeks further compensation either for the same duties as, or for duties performed simultaneously with, those duties required by the terms of employment. *See, e.g., Robinson v. Munn*, 238 N.Y. 40, 42, 143 N.E. 784 (1924); *Freedman*, 271 A.D.2d 301, 706 N.Y.S.2d 405; *Mance v. Mance*, 128 A.D.2d 448, 513 N.Y.S.2d 141, 142 (1st Dep't 1987). The only case cited by Defendants that involves comparable facts to the present situation does not support summary judgment here. *LaJaunie*, 159 A.D.2d 349, 552 N.Y.S.2d 628, involved a purported agreement to purchase a one-third equity interest in a restaurant at a nominal price in exchange for the design, renovation and management of that restaurant. Following negotiations, the parties failed to reduce this agreement to writing. Nevertheless, the plaintiff received a salary of $300 per week until his termination shortly after the opening of the restaurant. Plaintiff sought to recover the equity interest in *quantum meruit* arguing that the salary he earned was solely for his

labor in furtherance of the renovations. The court granted summary judgment because the payment of the plaintiff's salary began six months prior to the start of renovations, calling into doubt the plaintiff's argument. Here, Defendants did not begin paying Plaintiffs for services provided as employees until well after they had developed their business plan and presented it to MDC—work that was thus performed prior to their actual employment by OSI. Thus, the salaries which they admittedly received after OSI was formed do not undermine the claim of reasonable expectation of compensation for the idea itself.

**12.** For this reason, MDC's independent argument for summary judgment would also likely fail. MDC contends that it is not a proper party to Plaintiffs' *quantum meruit* claim because any services were performed exclusively for the benefit of OSI, not MDC. (*See* Def. Mem. Supp. at 11–2.) As a result, it claims, Plaintiffs could only have expected compensation from OSI. This is not necessarily the case. The services for which Plaintiffs seek recovery in *quantum meruit* involve the founding of OSI, and MDC was clearly the

formed by the Plaintiffs in connection with their developing the business plan which they used to attract financing for their proposed venture. In their *quantum meruit* claim, Plaintiffs allege that the Defendants took their idea without adequately compensating them. Therefore, the rule barring recovery in *quantum meruit* by employees for further compensation does not apply to this case.

Defendants' main arguments for summary judgment are essentially the arguments made, or are related to those made, in their motion to reconsider. Defendants reassert their argument that the Term Sheet did not contemplate a grant of equity apart from options, and insist that even after discovery, there is no real evidence extrinsic to the Term Sheet that Plaintiffs had a reasonable expectation of equity apart from options. Additionally, Defendants now insist that the Stock Plan governs grants of equity to the Plaintiffs, and since its terms are incorporated by reference in the Option Agreements, recovery in *quantum meruit* for equity is barred. Plaintiffs, for their part, continue to contest the Defendants' interpretation of the Term Sheet, and argue that even if the Term Sheet only contemplated options, there is now sufficient evidence that the Plaintiffs reasonably expected to receive equity apart from options to survive summary judgment.

Even when the available evidence is read, as it must be for these purposes, in the light most favorable to Plaintiffs, this Court must conclude that the Plaintiffs have failed to show the existence of a factual dispute that is both material and genuine, as required by Rule 56 of the Federal Rules of Civil Procedure. As previously stated, the true gravamen of Plaintiffs' claim for *quantum meruit* is that they expected to receive a degree of equity participation far in excess of the options that they actually received as consideration for selling their business idea to the Defendants.

The best evidence of what the Plaintiffs expected to receive for their idea is contained in the Term Sheet, which was negotiated by the parties shortly after Plaintiffs approached MDC for financing. In general terms, the Term Sheet proposed a significant contribution of capital by MDC, which in return would receive a majority equity stake in the venture, and control of its Board of Directors. Plaintiffs, in turn, were supposed to provide the business plan, industry experience, and labor, in exchange for remuneration based upon a combination of salary, bonuses and a degree of equity participation. The Term Sheet contains a series of provisions that flesh out this general exchange, including distinct terms that address the salaries and bonuses to be paid to Plaintiffs and the type of equity involvement that they could expect in the venture.[13] Thus, the Term Sheet provides both (1) that Plaintiffs will be hired as managers and given salaries, and (2) that they will participate in owning equity both (a) by an opportunity (and indeed, an obligation) to purchase stock, and (b) through the creation of various plans that would provide for the award of stock options, and perhaps direct grants of stock. However, the Term Sheet does not in any way segregate certain portions of the total package of consideration to be provided to Plaintiffs (still less discriminate different forms of equity participation) as compensation for their business plan, and identify other aspects as compensation for services rendered as employees.

beneficiary of Plaintiffs' services before OSI came into existence. At this point, however, the issue need not be resolved since summary judgment is warranted on other grounds.

**13.** As noted above, these terms concerned the arrangements that would exist once OSI was founded. Additional provisions governing the payment of salaries and bonuses to the Plaintiffs before OSI would come into existence, in exchange for services performed in founding OSI (such as identifying acquisitions targets and managing the affairs of the incipient entity) were set forth in a separate letter agreement. (*See* King Decl. Ex. A.)

Rather, the Term Sheet appears to contemplate that Plaintiffs would receive an aggregate package of financial rewards.

The Term Sheet was meant to be only a manifestation of the parties' intent to establish a future business relationship on the basis of the provisions contained therein. Its proposed provisions were not intended to be binding in the absence of formal contracts, but were supposed to act as a point of departure for the rights and obligations that the parties expected to embody in binding agreements later on. Whether wisely or not, the Plaintiffs apparently offered their idea to MDC not for a specific sum of money, but rather in exchange for MDC's providing the bulk of the capital that would enable them to put the idea into practice, the opportunity to work as managers of the venture on salary (the exact salary to be determined at some future time), and a degree of equity participation that is sketched out in the Term Sheet but was expected to be settled with finality only some time in the future.[14] Thus, while it is important to understand what the Term Sheet actually provides, those terms are not in themselves binding.

Plaintiffs may be correct that the Term Sheet provides for a potential direct grant of equity, as well as for stock options. As both parties agree, the relevant provisions in this case are found under the section of the Term Sheet appropriately entitled "Management Equity Ownership." (King Decl. Ex. A., at Term Sheet 1.) That section of the Term Sheet contains three separate paragraphs, each of which provide for grants of options and/or equity to the Plaintiffs under three separate programs. Under the first paragraph, Plaintiffs are required to make a capital contribution, in return for which they presumably would receive stock. As noted at p. 430 above, this expectation was fulfilled, in that Plaintiffs made capital contributions at the required amount, and received stock in return. The second paragraph contemplates the adoption of a time-vesting option award plan. Under that plan, Plaintiffs would receive options permitting the purchase of equity up to a specified percentage of the venture's stock, the options to vest over time on a set schedule.[15] The "A" Option Agreements ultimately embodied this time-vesting option plan.

The third paragraph contemplates the creation of "an additional option plan." Unlike the option plan just discussed, this plan would entitle the Plaintiffs, and other "key members of management," to acquire stock if the venture attained certain performance targets, including at least one actual acquisition of a business. The full terms of that paragraph are as follows:

> The Company will also put into place an *additional option plan* which will entitle certain key members of management (to be decided upon in consultation with Mr. Kreiss) to receive options for an amount

---

**14.** Because Plaintiffs chose to sell the Defendants their idea, rather than a stake in a going concern, MDC in essence shouldered some of the risks of starting up the proposed venture. Thus, the contingent nature of the parties' relationship can be seen as a hedge against the risk of implementing the Plaintiffs' untested idea, and it effectively preserved the rights of the parties to reassess the value of the proposed venture at some point in the future. There were other examples of such hedging mechanisms in the parties' relationship. For example, although Defendants were contractually obligated to pay the Plaintiffs for services rendered in the six months anticipated for the formation of OSI, Defendants nevertheless had the right to terminate the relationship after three months while bearing the burden of compensating Plaintiffs for only one additional month if they terminated the relationship. (*See* King Decl. Ex. A, at Cover Letter 1.)

**15.** The provision in question reads in full:

> The Company will put in place an option program whereby Mr. Kreiss will be eligible to receive options to purchase common equity of the Company equal to 2.5% of the Company at a strike price equal to the price per share paid by MDC. These options will vest over a five year period commencing on the first anniversary of the closing at which time 33% of such options will vest. After such anniversary, the options will vest equally on a monthly basis.

up to 12.5% of the common equity of the Company (on a fully diluted basis) at a strike price equal to the fair market value of such equity at the time of the grant (which price will be the price per share paid by MDC for the grants at closing *under such program* ) if certain performance based targets are met. *At the time of the initial Acquisition, Mr. Kreiss and Mr. Shelton will be entitled to receive 5.0% and 1.5%, respectively, of the common equity of the Company* under this program. In the Board's sole discretion, Mr. Kreiss may also be entitled to receive options for an additional 0.5%–1.0% of the common equity of the Company *under this program* if certain "super performance" targets are met over a period of time (such targets expected to be defined as between 20%— 40% in excess of the performance targets referred to above). Performance targets (other than the "super performance" targets) under this program will be tied to the same operating targets as that of the annual incentive compensation program referred to below. MDC may, from time to time, consider increasing the percentage of common equity available *under this program.*

(*Id.* (emphasis added).) [16] Plaintiffs rely on this provision, and in particular the italicized sentence, as the primary basis for their claim that they expected to receive shares, and not merely the option to purchase shares, in the new venture.

Taken together, these three paragraphs from the Term Sheet provided that any equity participation by Kreiss and Shelton, in whatever form, would be made pursuant to one of three proposed plans (corresponding to the three paragraphs) governing capital investment, awards of time-vesting options, and awards of performance-based options (and perhaps grants of equity), respectively. There is no dispute that the first two paragraphs were

later embodied, in whole or in part, in executed agreements. The dispute concerns the intended scope of the performance-based awards.

The italicized passage states that Plaintiffs would be entitled to receive 5% and 1.5% respectively of OSI's "common equity," and that any such grant would be given "under this program," indisputably a reference to the performance-based option plan described in the previous sentence. That sentence is susceptible to different readings—particularly when it is remembered that the Term Sheet was not intended to be a binding agreement, and that its language accordingly is not intended fully to articulate binding commitments. It can quite plausibly be read as providing that Plaintiffs would simply receive a direct grant of stock in the company at the time of the first acquisition. After all, the sentence states that upon that event Plaintiffs would "receive" (not "have the opportunity to purchase") "common equity" (not "options"). On the other hand, it can also plausibly be read to provide for the provision of options representing the prescribed percentage of the company's equity. After all, the award is to be made "under this program," the only program under discussion is clearly characterized as an "option plan," and that plan has been characterized, in the heading of the relevant section of the Term Sheet, as an aspect of "Management Equity Ownership." In a relatively sketchy non-binding Term Sheet of this kind, ambiguities of this kind are unsurprising, and neither reading can be excluded as implausible, or even, given the context, regarded as particularly strained.

█ This dispute over the meaning of the Term Sheet provisions, however, cannot preclude summary judgment. While the ambiguous nature of the Term Sheet presents a *genuine* dispute about what the parties to it expected, such ambiguity is not *material* for the purposes of resolving

---

**16.** The underlining in the quoted passage is supplied by the Court. The italicized sentence was quoted by Judge Ward in his opinion, except for the underlined portion, which was elided.

the present dispute. As Judge Ward correctly ruled, recovery in *quantum meruit* is unavailable where an express contract covers the subject matter in issue. *See Kreiss,* 37 F.Supp.2d at 302; *see also* cases cited at p. 437 above. That was why Judge Ward dismissed Plaintiffs' *quantum meruit* claim for options contemplated in the Term Sheet, but not actually provided to Plaintiffs under the binding Option Agreements actually put into place. Plaintiffs argue, in effect, that even if there were express contracts that covered the subject of "options," there was never an express contract covering a separate "subject matter" that could be characterized as "direct grants of equity to key members of management upon the completion of the first acquisition." At least at the motion to dismiss stage, Judge Ward accepted this distinction—upon reargument, however, leaving the question to be revisited in connection with defendants' motion for summary judgment. *See* above p. 434 & n. 7. On the fuller record now available, it is clear that there is no such separate "subject matter," as characterized by the Plaintiffs.

The Term Sheet, setting forth the nonbinding expectations of the parties at the time it was created, contemplated the creation of a performance-based option plan (as well as two other types of Management Equity Ownership programs), that provided for the award of certain types of options, and (perhaps) for a direct equity grant. When, as the Term Sheet expressly contemplated would occur, its rough provisions were reduced to binding contracts, the parties did indeed create a series of agreements, including the "B" Option Agreements granting the Plaintiffs performance-based options (as well as the two other equity participation schemes—capital contribution and time-vesting options—contemplated in the Term Sheet). (*See* Kurtz Decl. Exs. P & Q.) That the terms of the ultimate binding agreement differ in significant respects from the precise terms projected by the Term Sheet, and do so in ways that are less favorable to Plaintiffs than what was originally contemplated, does not mean that the option agreements governing performance-based option awards created by the parties do not cover the same "subject matter" as the disputed paragraph in the Term Sheet. The "B" Option Agreements effected the performance-based option awards described in the Stock Plan. They constitute precisely the "additional option plan" contemplated in the third paragraph of the Term Sheet's "Management Equity Ownership" section, under which the Plaintiffs claim they expected to receive a direct grant of equity.

Thus, when it came time to embody the Term Sheet provisions in binding contracts, the parties chose to put in place an equity participation program that granted the Plaintiffs time-vesting options, and performance based options, leaving open the possibility of receiving equity (in the form of grants of restricted stock), if performance targets to be set by the Board in their sole discretion were met. On their face, the terms of the "A" and "B" Option Agreements, and the provisions of the Stock Plan that they put into effect, appear to govern the same subject matter as the proposed plans described in the second and third paragraphs of the "Management Equity Ownership" section of the Term Sheet—the granting of time-vesting and performance-based options and direct grants of equity.[17] In particular, the "B" Option Agreements cover the very subject matter—the "additional [performance-based] option plan"—discussed in the third

---

17. Plaintiffs have contended that the Stock Plan cannot preclude recovery in *quantum meruit* because it is not a contract. This argument fails because, as Defendants correctly point out, the terms of the Stock Plan are incorporated by reference into the Option Agreements, which are contracts. (*See* Kurtz Decl. Exs. P & Q ¶ 1; King Decl. Exs. B & C ¶ 1.) Similarly, the Stock Plan provided that the Option Agreements, which were to accomplish equity participation by management, were to be the vehicles for effecting the Stock Plan. (*See* King Decl Ex. F ¶ 2.)

paragraph of the "Management Equity Ownership" section of the Term Sheet. Under the Stock Plan's provisions, OSI's Board of Directors could have, in its own discretion, provided restricted stock "in lieu of" any option awards, but it chose not to. (King Aff. Ex. F ¶ 7(a).) Even accepting as correct Plaintiffs' interpretation of the Term Sheet as contemplating equity awards as well as options, it is difficult to escape the conclusion that the express agreements between the parties supersede any expectations for compensation the Plaintiffs may initially have had, as evidenced in the non-binding Term Sheet, and that *quantum meruit* recovery on the strength of those expectations is therefore unavailable.

Plaintiffs point out that they failed to receive the full panoply of equity participation set forth in the Term Sheet. The "A" Option Agreements provided Plaintiffs with time-vesting options; however, the award given fell short of the 2.5% equity stake set out in second paragraph of the Term Sheet, at least with respect to Kreiss. Plaintiffs also received fewer performance-based options under the "B" Option Agreements, and none of the performance-based equity, that Plaintiffs contend had been outlined in the second paragraph of the Term Sheet. They remained eligible to receive discretionary grants of restricted stock from OSI's Board, under terms solely within the Board's discretion, but they apparently failed to meet the appropriate requirements. The issue is whether the Option Agreements, along with Plaintiffs' eligibility for discretionary grants of equity, covered the same subject matter as their reasonably-expected compensation, as evidenced by the Term Sheet.

Plaintiffs contest the conclusion that they did by characterizing the Term Sheet as contemplating two distinct elements of compensation (options and equity) and arguing that they received only one (options). However, it is inappropriate to view equity and options as distinct elements of compensation rather than treating them (as the Term Sheet itself does) as one type of compensation, equity participation, with capital contribution, time-vesting and performance-based components. What the Plaintiffs were supposed to get was some degree of equity participation, consisting of a largely unspecified combination of options and equity, with the details to be worked out later. They eventually got agreements embodying some of the proposed time-vesting and performance-based options but no equity.

Had the Plaintiffs received some options and some equity, albeit in lesser amounts than the Term Sheet provided, it would be self-evidence that the parties had agreed to modify the proposed package of equity participation. That the reduction in compensation in the executed contracts took the form of all options and no direct equity grant does not change this conclusion. Plaintiffs' ultimate agreements with Defendants may not have been as favorable to them as they expected at the time of the Term Sheet. However, establishing recovery in *quantum meruit* for the failure of those agreements to include the expected grant of equity requires a different showing than Plaintiffs have managed to make here. The crucial evidence, if any, must speak to whether at the time the parties executed the Option Agreements, their expectation of receiving a direct grant of equity survived the grant of options under the Option Agreements and their continued eligibility to receive direct grants of stock pursuant to the Stock Plan. Recovery might be justified, for example, if the evidence showed that at the time the parties executed the Option Agreements, the Plaintiffs were led to believe that they would receive grants of equity, or they complained at not having received such equity. Evidence of this nature might create a material dispute sufficient to defeat summary judgment, but Plaintiffs have conspicuously failed to provide any.

The evidence that Plaintiffs have mustered in an effort to show that they re-

tained a reasonable expectation of an equity award even after the execution of the Option Agreements does not meet this standard. There is no evidence at all that the Plaintiffs complained about not having received equity when the Option Agreements were executed, even though they were vociferously complaining about other asserted changes in the terms of their employment during precisely the same period of time.[18] Plaintiffs point to a settlement proposal made by Timothy Beffa, upon his replacing Kreiss as CEO of OSI, as suggesting that both parties recognized the Plaintiffs' entitlement to equity for the sale of their idea to the Defendants. This proposal contained an offer of an "initial equity position of 1¼%." (Kreiss Decl. Ex. G.) Plaintiffs claim that the Beffa proposal was an attempt to change Plaintiffs' terms of compensation from the larger numbers in the Term Sheet (5% and 1.5%) to 1 ¼%, but neither the plain terms of Beffa's notes nor elicited testimony indicates that this proposal was in any way related to the proposals made in the Term Sheet, rather than a different proposal describing a separate and new compensation arrangement. The Beffa proposal was made well after the Option Agreements were executed, and this document standing alone merely presents a proposal to grant Kreiss an equity stake if they agreed to some new employment arrangement. Plaintiffs' attempt to characterize this proposal as evidencing a continued expectation of equity compensation is purely speculative and does not create a genuine factual dispute for summary judgment purposes.

The remaining evidence presented by the Plaintiffs, even read in the most favorable light, merely reinforces the view that Plaintiffs believed that the Term Sheet itself contemplated a grant of equity apart from options, and is therefore immaterial to resolving this summary judgment mo-

tion. For example, Plaintiffs cite their investment banker's testimony that he "intended and wished to acquire direct grants of equity" for Plaintiffs. (See Pl. Mem. Opp. at 16.) Plaintiffs also point to the failure of the attorney responsible for drafting the Term Sheet to articulate a reason for using the phrase "common equity" rather than "options" in the sentence in controversy. Similarly, the deposition testimony of Plaintiffs' attorney reveals that he did not know whether his summary outline of the Term Sheet indicated that Plaintiffs would get a direct grant of equity. Whatever bearing these claims have on the proper interpretation of the Term Sheet, none of them are relevant to the controlling question here: whether the Plaintiffs' hopes for a direct equity grant can be characterized as a separate and distinct expectation of compensation not covered by the express agreements they ultimately reached with OSI.

Plaintiffs' opposition papers fail to suggest a single genuine and material dispute that their expectation of equity reasonably survived the parties' execution of the Option Agreements. Even if Plaintiffs expected a direct grant of equity because of what the Term Sheet stipulated, what they ended up agreeing to were options and discretionary grants of restricted stock. In the absence of evidence to the contrary, it appears that the parties simply renegotiated their original deal on terms that were less favorable to the Plaintiffs than was originally the case. If Plaintiffs originally expected that they would receive a direct grant of equity, there is nothing to challenge the conclusion that by the time the Option Agreement was signed, these expectations had been reduced to a mere eligibility to receive stock.

Indeed, the *only* real evidence that might permit a finder of fact to draw any

---

18. Indeed, at the time of their resignations, the plaintiffs specifically put the Board of OSI on notice that they expected to receive a "fair market value" for the options and equity held, as well as any severance pay due, but make no mention of any equity stake which they believe are still owed to them. (See Kurtz Decl. Exs. N & O.) Although not dispositive, this silence does undermine their claim of a surviving expectation of equity.

such inference is the discrepancy between the provisions of the Term Sheet and those of the Option Agreements and Stock Plan. But it cannot be the case that a simple discrepancy between proposed contractual terms set out in an admittedly non-binding document and subsequent agreements effecting those proposed provisions by itself raises a genuine issue of fact sufficient to survive summary judgment. Holding otherwise would permit any contract dispute in which the actual terms deviate from proposed terms to go to a jury so long as a plaintiff makes an uncorroborated claim that its expectation of compensation was based on the proposed terms rather than the terms actually executed. Such a result would effectively eviscerate the rule barring recovery in *quantum meruit* where an express agreement governs the same subject matter.

In the present case, the Plaintiffs got what they expected as consideration for their business idea, namely some degree of equity participation, the extent and terms of which would be settled at a later date. At that later date, they received time-vesting and performance-based options (subject to OSI's repurchase rights) and eligibility for discretionary grants of restricted stock (subject to discretionary performance requirements). Whether or not this amounted to a good bargain is not an issue that this Court is authorized to resolve. *Quantum meruit* cannot be used by the Plaintiffs to question the adequacy of a bargain that Plaintiffs believe in retrospect to have been a poor one. The record before this Court warrants summary judgment in favor of the Defendants.

### III.  *Prevailing Party Fees*

Defendants have moved for summary judgment on their counterclaim for prevailing party fees. A prevailing party may collect attorneys' fees if an award is authorized by agreement. *See In re A.G. Ship Maint. Corp.*, 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 (1986). Section 5.7(d) of the Stockholders Agreement provides that a prevailing party is entitled to reimbursement for the costs of litigation from the non-prevailing party, including reasonable attorneys' fees, in any action "arising out of or with respect to this Agreement or the transactions contemplated hereby." (King Decl. Ex. D § 5.7(d).) In the present case, Defendants may clearly recover for their defense of the breach of contract claims in this motion for summary judgment, since resolution of those claims implicated the repurchase provision of the Stockholders Agreement.

Defendants may not, however, recover for defending the *quantum meruit* claim, because this claim cannot be characterized as "arising out of or with respect to" the Stockholders Agreement, or transactions contemplated therein. The *quantum meruit* claim relates to a claim for a benefit conferred before the Shareholders Agreement was executed, namely the sale of the Plaintiffs' business idea, and consequently it cannot logically involve a transaction "contemplated" by that document. Even so, Defendants may still recover fees for defending the *quantum meruit* claim if it can be said that this claim is inextricably intertwined with the breach of contract claims. *See Binghamton Precast & Supply v. A. Servidone Inc./B. Anthony Constr. Corp.*, 257 A.D.2d 731, 733, 682 N.Y.S.2d 719 (3d Dep't 1999). This is also not the case in the present instance. Here recovery in *quantum meruit* is grounded upon Plaintiffs' expectations prior to the founding of OSI, whereas recovery on the breach of contract claims rest on a calculation of the book value of the repurchased options. These claims are not sufficiently intertwined, and thus Defendants may not recover costs incurred in defending the *quantum meruit* claim.

Having prevailed on claims arising from the repurchase provisions of the. Stockholders Agreement, Defendants are entitled to recover from Plaintiffs for costs incurred in defending this aspect of the litigation, including reasonable attorneys fees.

*Conclusion*

For the foregoing reasons, Defendants' motion for summary judgment is granted, and Defendants are ordered to submit appropriate support for their fees and costs within 30 days.

SO ORDERED: