NUVEST, S. A., Plaintiff-Appellee,

v.

GULF & WESTERN INDUSTRIES, INC., Natural Resources Group, a division of Gulf & Western Industries, Inc., Defendants-Appellants.

No. 533, Docket 80-7747.

United States Court of Appeals, Second Circuit.

Argued March 16, 1981.

Decided June 2, 1981.

---

Roy L. Reardon, New York City (Barry R. Ostrager, Dennis G. Jacobs, Nancy F. McKenna, Richard L. Mattiaccio, and Simpson, Thacher & Bartlett, New York City, on brief), for defendants-appellants.

Arthur J. Homans, New York City (Jacob Gerstein, Alexander Stone, William C. Kratenstein, New York City, on brief), for plaintiff-appellee.

Before LUMBARD and NEWMAN, Circuit Judges, and TENNEY, District Judge.*

TENNEY, District Judge:

Defendants, Gulf & Western Industries, Inc., and its Natural Resources Group (collectively referred to as "G & W"), appeal from a judgment entered in the Southern District of New York, John M. Cannella, Judge, following a jury verdict in favor of the plaintiff, Nuvest, S. A. ("Nuvest"). The jury awarded Nuvest $850,000 plus interest on its finder's fee contract with G & W. Defendants also appeal from Judge Cannella's denial of their motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial.

This case hinges on whether a finder or broker can recover damages because of the seller's bad faith in thwarting negotiations,

* Honorable Charles H. Tenney, Senior District Judge of the Southern District of New York, sitting by designation.

even if the buyer and seller never reached a final meeting of the minds. Judge Cannella ruled that this theory of recovery was available to the plaintiff, and he instructed the jury that Nuvest could recover if a "meeting of the minds and the final execution of the formal contract was prevented by the defendants' bad-faith conduct." Explaining further, Judge Cannella stated that: "The question is whether there was a genuine lack of consensus . . . or whether the defendants deliberately attempted to avoid payment of the plaintiff's commissions by maintaining an arbitrary or unreasonable position . . . in order to cause a breakdown in negotiations." Because there was substantial evidence adduced at trial showing that G & W wilfully prevented a final agreement, the jury's finding of bad faith cannot be disturbed. It remains, however, for this court to resolve whether New York law permits a finder to recover on the basis of the seller's bad faith when an agreement on essential terms has either been reached or is imminent. We find that it does.

*Background*

In the fall of 1976, G & W was interested in finding a joint venturer to invest in coal properties, some of which G & W already owned and hoped to develop, and others of which were to be acquired in the future. The president of Nuvest, Nelson Camilleri, heard about G & W's plans and mentioned them to Michael Corrie, then president of Scallop Coal Corporation ("Scallop"), a member of the Royal Dutch Shell group of companies. After Corrie expressed interest in exploring a coal deal, G & W executed a finder's fee contract with Nuvest, providing in pertinent part:

> We [G & W] agree, in the event that Scallop Coal Corporation or any other subsidiary or entity affiliated with or controlled by [the Royal Shell Group] (your investor) purchase[s] an interest in any coal companies or coal properties owned or acquired by us[,] to pay you a finder's fee of 5% of the cost to your investor[.]

Over the next 21 months, Scallop's president Corrie negotiated with G & W's Natural Resources Group, which was represented by its chairman and chief executive officer, Richard Hogeland, and by its chief in-house counsel, Ira Barsky. After considering a very large joint venture, covering several coal properties, the parties narrowed their discussions to one investment, the Solar Fuel Company ("Solar"), which G & W had acquired in December 1976. On February 9, 1978, Scallop executed a letter of intent to purchase a 50% interest in Solar at a price of $17 million, subject to four conditions: (1) confirmation of Solar's coal reserves, (2) receipt of a satisfactory financial report on Solar from Scallop's own auditors, (3) negotiation of formal instruments, and (4) approval by the respective boards of directors.

By the late spring of 1978, the parties' disagreements centered on the first and third of the conditions listed above. Scallop's own geological survey of Solar's property showed that the coal reserves were not as substantial as the parties had originally thought them to be. Accordingly, Scallop wanted a reduction in the price. Hogeland testified that he "did get a report from my geologists who said [Scallop's] geologists were correct," but he nonetheless tried to negotiate for a price of $17 million as originally contemplated. Both Corrie and Hogeland testified, however, that their differences over price were not irreconcilable. The jury implicitly accepted this testimony and found that Scallop would have signed a contract containing a price term of $17 million. The jury was instructed to calculate damages by applying Nuvest's finder's fee of 5% to the price the parties would have included in their final agreement. The jury's award of $850,000 is 5% of $17 million.

The negotiations were ultimately terminated by G & W's refusal to give Scallop certain unqualified warranties that were included in Scallop's first draft of the final agreement. Prior to its receipt of the draft contract, the Natural Resources Group had confirmed G & W's willingness to give Scallop unqualified warranties. After review-

ing the draft, Hogeland informed Nuvest's president that it conformed to the parties' understanding, and advised David N. Judelson, G & W's president, that it correctly reflected the parties' intent. In its return draft, however, G & W proposed to qualify or eliminate many of these warranties. In particular, G & W objected to five primary warranties: (1) a warranty of good title on the many properties held by Solar, to which G & W suggested that Scallop should rely on title insurance; (2) a blanket warranty that Solar's business violated no laws, to which G & W suggested a "best of its knowledge" warranty; (3) a warranty that G & W would bear the full expense of any contingent royalty fees owed to Solar's prior owner, to which G & W suggested that the joint venturers share the risk equally; (4) a warranty that G & W would bear all liabilities incurred between a freeze date on the balance sheet and the closing, to which G & W suggested that the parties share the liabilities equally; and (5) a warranty that G & W would establish an escrow account to cover any liabilities, to which G & W suggested that the escrow account be eliminated.

Both sides sought to' characterize these warranties at the trial and on appeal. For example, in cross-examining Hogeland, G & W brought out that "Royal Dutch and Scallop's attorneys drafted the tightest agreement that it could containing the most favorable provisions that they could find for their client." Hogeland responded, "Of course, and then when I sat down with Corrie, we started to take those things apart, of course." Nuvest, on the other hand, elicited testimony from Corrie and Hogeland that unqualified warranties are "customary" and that "best knowledge" warranties are "not normal." In addition, Nuvest offered as exhibits several documents executed in connection with G & W's acquisition of Solar in December 1976. In a letter of intent, G & W requested "such covenants, representations and warranties as are customary in transactions of this type," and in the formal contract, G & W received unqualified warranties of the type Scallop wanted.

Besides discussing the terms of the warranties themselves, Nuvest presented substantial additional evidence to show that Judelson purposely effected an impasse by qualifying the previously contemplated warranty terms in order to avoid paying a finder's fee. The plaintiff's version of the events begins with a meeting in mid-June between Hogeland and Judelson. When Judelson learned of Nuvest's 5% fee, he was "outraged . . . [and] walked out of the room for a couple of minutes to calm down." According to Judelson's own recollection, he said to Hogeland, "Why do you need a broker to call Scallop? My own son, who is ten years old, knows who the Shell Company is. It is not like you are looking for a needle in a haystack. You could have called them directly." Hogeland testified that Judelson told him, "I will show you how to sell a company without having anyone in between . . . ." The plaintiff argued that from mid-June through August 1, when Judelson met with Scallop's president Corrie, Judelson deliberately prevented a final agreement—by taking control away from Hogeland, by shifting legal work from the Resources Group's counsel to G & W staff counsel, and ultimately by qualifying the warranties previously deemed acceptable by Hogeland and the Resources Group staff.

G & W, of course, argues that Judelson's outrage at Nuvest's 5% fee did not foreclose vigorous negotiations. Judelson testified that he was "very disturbed . . . but nothing [was] going to get in the way of my doing the Scallop deal because Gulf & Western need[ed] them as a partner." Describing Scallop's proposed draft, he said counsel reported that "we had never been presented with a document that was this rigid with our assuming all representations, warranties and guarantees, known or unknown, ever before." And even if G & W was already negotiating with other purchasers during the last months of discussions with Scallop, that was a permissible business backup in case the Scallop deal fell through.

All this evidence is pertinent to the plaintiff's claim which, in the absence of a final

agreement, rests on an allegation of bad faith. Because there was ample evidence from which the jury could have inferred G & W's bad faith, the question on this appeal is whether a seller's bad faith warrants recovery on a finder's fee contract, even though there was no sale, if agreement on the essential terms of the sale had either been reached or was imminent. We turn now to that question.

*Discussion*

 The parties in this case agree on the basic standard under New York law for a finder or broker to earn his fee: he must produce a buyer ready, willing, and able to meet the seller's terms. *Lane—The Real Estate Dep't Store, Inc. v. Lawlet Corp.*, 28 N.Y.2d 36, 319 N.Y.S.2d 836, 268 N.E.2d 635 (1971); *Hecht v. Meller*, 23 N.Y.2d 301, 296 N.Y.S.2d 561, 244 N.E.2d 77 (1968); *Levy v. Lacey*, 22 N.Y.2d 271, 292 N.Y.S.2d 455, 239 N.E.2d 378 (1968). Of course, this "well-settled rule" applies only "in the absence of an agreement to the contrary." *Lane—The Real Estate Dep't Store, Inc. v. Lawlet Corp., supra*, 28 N.Y.2d at 42, 319 N.Y.S.2d at 840, 268 N.E.2d at 638. The parties are free, for example, to "condition the seller's liability on the closing of title or [to] require the broker to supply a buyer to purchase the property at a specified price 'with terms to be arranged.'" *Id.*, 28 N.Y.2d at 42, 319 N.Y.S.2d at 840, 268 N.E.2d at 638. With a closing-of-title condition, no fee is earned unless the deal is consummated. *E. g., Levy v. Lacey, supra*, 22 N.Y.2d at 274, 292 N.Y.S.2d at 457, 239 N.E.2d at 379; *Langfan v. Walzer*, 13 N.Y.2d 171, 173, 244 N.Y.S.2d 305, 307, 194 N.E.2d 124, 125 (1963). With a condition that terms are to be arranged, no fee is earned until all terms have been settled. *E. g., Kaelin v. Warner*, 27 N.Y.2d 352, 318 N.Y.S.2d 294, 267 N.E.2d 86 (1971).

 Regardless of any such conditions, however, the underlying structure of the relationship remains the same: the broker is the seller's agent for procuring a buyer. Under both contract law and agency principles, the parties owe each other a duty of good faith. Thus, even if the conditions in a finder's fee contract have not been fulfilled, "the seller will nevertheless be liable if he is responsible for the failure to perform the condition." *Lane—The Real Estate Dep't Store, Inc. v. Lawlet Corp., supra*, 28 N.Y.2d at 43, 319 N.Y.S.2d at 841, 268 N.E.2d at 639; *Levy v. Lacey, supra*, 22 N.Y.2d at 276, 292 N.Y.S.2d at 459, 239 N.E.2d at 381. To similar effect, the Restatement of Agency (Second) comments that "[w]hen the principal has furnished the broker with only part of the terms, with the understanding that further details are subject to negotiation between the principal and the customer, the principal, *unless acting in bad faith* (see § 454), is free to terminate such negotiations without liability to the broker." Restatement of Agency (Second) § 445, comment d, at 347 (1958) (emphasis supplied), quoted in *Kaelin v. Warner, supra*, 27 N.Y.2d at 356 n.1, 318 N.Y.S.2d at 296 n.1, 267 N.E.2d at 88 n.1.

The critical dispute between Nuvest and G & W is aptly conveyed by juxtaposing two cases, *Kaelin v. Warner, supra*, and *Trylon Realty Corp. v. DiMartini*, 40 A.D.2d 1029, 338 N.Y.S.2d 945 (2d Dep't 1972), *aff'd*, 34 N.Y.2d 899, 359 N.Y.S.2d 284, 316 N.E.2d 718 (1974). In *Kaelin*, on which the defendants primarily rely, the broker could not recover his commission because, even though the seller and buyer had agreed on price, there was no meeting of the minds on the final and complete terms of the sale. In *Trylon*, on which the plaintiff primarily relies, the broker collected his fee because the seller had wrongfully terminated negotiations. Naturally, each side in this dispute attempts to distinguish the other side's authority from the case at hand. A review of the two central cases helps put the instant action into proper perspective.

In *Kaelin v. Warner, supra*, the broker produced a buyer ready, willing, and able to meet the sellers' price, but the parties disagreed over several important terms. The buyer proposed the following conditions: (1) release clauses, (2) the privilege of prepayment after one year, (3) a guarantee as to acreage and a reduction in price if the acreage were less than promised, (4) de-

layed times of payment, and (5) a later closing date. The sellers rejected these terms, and subsequently sold the property to another buyer. The trial and appellate courts ruled in favor of the broker, but the Court of Appeals reversed, holding that "[s]ince [the buyer] never reached an agreement with the [sellers] concerning the essential terms of the transaction, the [broker] did not earn his commission." *Id.*, 27 N.Y.2d at 356, 318 N.Y.S.2d at 296, 267 N.E.2d at 88. The court explained that "[o]n the record before us, it is clear that the defendants were free to negotiate with a second prospective buyer until such time as [the first prospective buyer] agreed to the terms they had offered. They were privileged to revoke or withdraw their offer at any time before receiving an effective acceptance." *Id.*, 27 N.Y.2d at 356, 318 N.Y.S.2d at 296, 267 N.E.2d at 88. According to G & W, these statements mean that a seller can stick to his original terms without thereby providing a basis for the trier of fact to find bad faith. In further support of its position, G & W also cites a handful of cases which follow *Kaelin v. Warner, supra,* denying the broker his fee where essential terms of an agreement were not settled. *E. g., Dakin v. Grossman,* 57 A.D.2d 941, 395 N.Y.S.2d 81 (2d Dep't 1977); *Tribune Assistance Corp. v. Nevins Warehouse & Trucking Corp.,* 54 A.D.2d 930, 388 N.Y.S.2d 315 (2d Dep't 1976); *Murray Adler Realty Co. v. Benerofe,* 42 A.D.2d 715, 345 N.Y.S.2d 1023 (2d Dep't 1973), *aff'd,* 34 N.Y.2d 583, 354 N.Y.S.2d 947, 310 N.E.2d 543 (1974); *Lemar v. Tenber Assocs.,* 41 A.D.2d 907, 343 N.Y.S.2d 295 (1st Dep't 1973); *Penzotti v. Broda Machine Co.,* 37 A.D.2d 340, 325 N.Y.S.2d 228 (4th Dep't 1971), *aff'd,* 33 N.Y.2d 815, 350 N.Y.S.2d 908, 305 N.E.2d 917 (1973).

In distinguishing *Kaelin v. Warner, supra,* however, the plaintiffs argue that that case never touched on the issue of bad faith because, as the Court of Appeals pointed out, a finding of bad faith could not have been supported there. Indeed, the court stated:

With respect to the plaintiff's contention that a seller may not terminate the bro-

ker's authority in bad faith and thereby avoid payment of a commission where the broker has already procured—or is on the verge of procuring—a buyer ready and able to complete the purchase upon the terms prescribed by the seller, it is enough to state that there is no evidence in the record before us to justify a finding of bad faith.

*Kaelin v. Warner, supra,* 27 N.Y.2d at 356, 318 N.Y.S.2d at 296, 267 N.E.2d at 88. Similarly, except for *Dakin v. Grossman, supra,* none of the additional cases cited by the defendants dealt with bad faith. In *Dakin,* the appellate court ruled: "The trial court erroneously concluded that the owner had . . . acted in bad faith in declining the sale. The record, however, supports a contrary finding." *Id.,* 57 A.D.2d at 941, 395 N.Y.S.2d at 82. This was a reversal on the facts, not on the law, and the decision does not govern a case where a finding of bad faith is adequately supported by the record. Thus, in the plaintiff's view, *Kaelin* and its progeny implicitly recognize that, even without a complete meeting of the minds, a seller's wrongful obstruction of negotiations that are headed for a final agreement can make the seller liable to the broker or finder.

The plaintiff contends that *Trylon Realty Corp. v. DiMartini, supra,* makes explicit what is suggested by *Kaelin v. Warner, supra,* and other cases: namely, that there is a bad-faith exception to the usual meeting-of-the-minds rule. In *Trylon,* the broker was hired to procure a commercial lessee for a landlord's property. After the parties had agreed on the space, the rental, and the term of the lease, the owner withdrew his application for a zoning variance which was crucial to the parties' agreement. The zoning board had already assured the landlord informally that the variance would be approved. In affirming the broker's recovery, the appellate court stated: "We may concede the absence of a complete accord between the principals, but the law is well-settled that a party may not take advantage of his own wrong in terminating negotiations in bad faith to prevent plain-

tiff from fulfilling his undertaking." *Id.*, 40 A.D.2d at 1030, 338 N.Y.S.2d at 947. The *Trylon* court explicitly distinguished *Kaelin v. Warner, supra*, on the ground that the *Kaelin* court expressly ruled that the evidence was insufficient to support a finding of bad faith.

G & W, in turn, tries to distinguish *Trylon*, pointing out that "the issue of bad faith was reached only after the court found that all essential elements of a shopping center lease had been reduced to writing." If we interpreted New York law as adopting such a strict rule, we would be saying, in effect, that the broker does not have a claim to his commission unless the buyer also has a possible claim under the sale contract. In *Trylon*, when the lessor withdrew his application for a zoning variance, he may have thereby breached both the sale contract and the finder's fee contract. But that possibility does not imply that a complete and enforceable sale contract is a prerequisite for the finder to recover his fee. Indeed, the Court of Appeals has demonstrated that we must consider these contracts separately. In *Hecht v. Meller, supra*, the court ruled that the plaintiff real estate broker was entitled to recover her fee even though the purchasers exercised their statutory right to rescind the contract after the premises were destroyed by fire. The court wrote: "At the juncture that the broker produces an acceptable buyer he has fully performed his part of the agreement with the vendor and his right to commission becomes enforcible [sic] [even if] . . . 'from a defect in the title of the vendor, or *a refusal to consummate the contract on the part of the purchaser for any reason in no way attributable to the broker*, the sale falls through.'" *Id.*, 23 N.Y.2d at 305, 296 N.Y. S.2d at 563–64, 244 N.E.2d at 78–79, *quoting Gilder v. Davis*, 137 N.Y. 504, 506, 33 N.E. 599, 600 (emphasis added). In short, the contractual rights of the broker are separate from those of the buyer.

On the other hand, the broker's rights are certainly related to those of the buyer. Although the principals needs not have concluded a complete, written agreement for the broker to recover his fee, the Court of Appeals has ruled that "it [is] a question of fact whether essential agreement [has] been reached and whether defendant wrongfully or arbitrarily prevented completion." *Trylon Realty Corp. v. DiMartini*, 34 N.Y.2d 899, 359 N.Y.S.2d 284, 316 N.E.2d 718 (1974), *aff'g*, 40 A.D.2d 1029, 338 N.Y.S.2d 945 (2d Dep't 1972). The exact meanings of the terms, "essential agreement" and "wrongfully or arbitrarily," are unclear, but it is certain that the Court of Appeals would not follow G & W's suggestion that "all essential elements . . . [must have] been reduced to writing." Presumably, once negotiations have progressed to the point where agreement on essential terms had either been reached or was imminent, the likelihood of finding a wrongful obstruction of negotiations increases with the completeness of the principals' understanding and with the arbitrariness of the purported grounds for the seller's withdrawal, but it is not mandatory that all elements of the deal be agreed upon. In addition, in affirming *Trylon*, the Court of Appeals said that "bad faith is not necessarily an essential ingredient to the finding of wrongful prevention." 34 N.Y.2d at 899, 359 N.Y.S.2d at 285, 316 N.E.2d at 718. In other words, while a showing of bad faith is sufficient to hold the seller liable, there may be other ways as well and wrongfulness is a question of fact.

In this case, G & W concedes that "there was testimony from which the jury could have concluded that Scallop might have met G & W's price terms if G & W had accepted [Scallop's] warranty terms." Nuvest's marshalling of that testimony and other evidence successfully convinced the jury that Scallop was ready, willing and able to purchase Solar at G & W's price of $17 million. Apparently, the jury was further convinced that G & W was prepared to sell Solar to Scallop on the original and customary warranty terms when Judelson insisted on qualifying the warranties to avoid having to pay Nuvest. Judge Cannella correctly stated the law when he instructed the jury that Nuvest could recover if a "meeting of the minds and the final execution of the formal contract was pre-

vented by the defendants' bad-faith conduct." The phrase, "meeting of the minds," presumably refers to those specific provisions which would have been memorialized in the "final execution of the formal contract." A failure to complete all details of the Solar sale, however, would not preclude a finding that the parties had reached an "essential agreement" which was headed for completion but for the defendants' wrongful conduct. As Judge Cannella explained, "The question is whether there was a genuine lack of consensus ... or whether the defendants deliberately attempted to avoid payment of the plaintiff's commissions." In a case like *Trylon Realty Corp. v. DiMartini, supra,* the landlord's withdrawal of an application for a crucial zoning variance gave the broker very strong, obvious support for his claims of bad faith. In this case, Nuvest had to prove bad faith from Judelson's statements and from the course of events in June and July 1978. But in both cases, a finding of bad faith was adequately supported by the record. Since the charge, read as a whole, adequately focused the jury's attention on both the existence or imminence of agreement on essential terms and the defendants' bad faith prevention of a completed contract, we will not disturb the jury's award.

The appellants have raised several other arguments, none of which constitutes grounds for reversal. First, they contend that Judge Cannella improperly allowed Hogeland and Corrie to testify about whether the warranties Scallop sought were "normal" or "customary." Hogeland and Corrie were well qualified to testify about such warranties, and their testimony did not, as the defendants assert, go to "ultimate" issues. The ultimate issue was whether G & W acted in bad faith, a matter that was left entirely to the jury. Second, the defendants raise a statute of frauds objection, which the court finds rather curious since the finder's fee contract was in writing. Apparently, the appellants' objection is that a court should not require a seller to compromise its terms unless such a requirement is reduced to writing. This objection, however, is merely a restatement of appellants' original argument, to which we have already responded that the seller's right to negotiate vigorously does not permit a bad faith evasion of the broker's fee in the circumstances of this case. Third, the defendants complain that Judge Cannella improperly summarized testimony from Corrie and Hogeland, who both said that there was no real dispute about price. The statements summarized were accurately conveyed to the jury; Hogeland and Corrie believed they could resolve their differences and that a completed sale was imminent.

The judgment is affirmed.