412 F.3d 315
 INDIA.COM, INC., Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,
India Holdings, Inc. and Easylink Services Corp. Counter-Defendants-Appellants-Cross-Appellees
v.
Sandeep DALAL, Defendant-Counter-Claimant-Appellee-Cross-Appellant.
 No. 03-9019(L).
 No. 03-9059(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: September 22, 2004.
 Decided: June 20, 2005.
 
 William F. Mueller, Clemente Mueller & Tobia, Morristown, NJ, for Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees India.com, Inc., Easylink Services Corporation and India Holdings, Inc.
 Paul J. Watford, Melinda R. Eades, Munger, Tolles & Olson LLP, Los Angeles, CA, for Defendant-Counter-Claimant-Appellee-Cross-Appellant Sandeep Dalal.
 Before: MESKILL, McLAUGHLIN, B.D. Parker, Circuit Judges.
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 The controversy that triggered this litigation is whether EasyLink Services Corporation ("EasyLink") must pay Sandeep Dalal, a former employee and sales broker, a commission on an aborted sale of India.com, Inc. ("ICI"), an EasyLink subsidiary, to Business India Publications Limited ("BI").[1] EasyLink and Dalal cross-appeal a judgment of the United States District Court for the Southern District of New York (Cote, J.), which awarded Dalal damages on the theory that he was a third-party beneficiary of a stock purchase agreement between EasyLink and BI. Because this conclusion was incorrect, we reverse. But because the District Court did not reach the question of whether EasyLink breached the agreement by intentionally frustrating its consummation to avoid paying Dalal's commission, we remand for further proceedings.
 
 BACKGROUND
 
 2
 In 2001, EasyLink, a global provider of electronic information exchange services, approached BI, a large magazine publisher in India, concerning the possible sale of an EasyLink subsidiary, ICI. ICI is an Internet services company, with offices in India and the U.S., that had experienced economic difficulties as a consequence of the collapse of the Internet market bubble. Dalal served as ICI's President of Global Alliances. Following its significant cash losses through ICI, EasyLink borrowed $5 million from ICI in February 2001. The loan was never repaid and the obligation became an issue in this litigation. That same month, Dalal learned that EasyLink, as a consequence of ICI's deteriorating economic condition, would be terminating his employment. At that point EasyLink also decided to sell ICI and several other subsidiaries and offered Dalal the opportunity to continue to work on a commission basis as a consultant to oversee the sale of ICI.
 
 
 3
 These arrangements generated a series of contracts central to this appeal: three brokerage agreements between Dalal and EasyLink, and a Stock Purchase Agreement between EasyLink and BI for the sale of ICI. In the First Agreement, signed in April 2001, Dalal agreed to locate and evaluate buyers for ICI and to assist in negotiating sales terms. In the First Agreement, Dalal agreed to devote a substantial portion of his time to the sale, to forgo an up-front retainer and to accept a variable commission for his services. Additionally, the First Agreement obligated Easylink to accept any offer of $500,000 or more for ICI. The Second Agreement, signed three months later, extended the terms of the First by thirty days.
 
 
 4
 After signing the First Agreement, Dalal approached a number of prospective buyers including BI, which had previously expressed an interest in acquiring ICI. By late May 2001, he had negotiated a term sheet with BusinessIndia.com, a subsidiary of BI, under which BusinessIndia.com agreed to buy ICI for cash and other consideration.
 
 
 5
 On October 26, 2001, EasyLink and BI signed a Stock Purchase Agreement ("SPA") for the sale of ICI, for a total consideration of roughly $7.5 million. The SPA contained a Negating Clause, Section 12.5, entitled "No Third Party Beneficiaries." This appeal principally turns on whether this clause is enforceable. It provides:
 
 
 6
 Neither this Agreement or any provision hereof nor any Schedule, exhibit, certificate or other instrument delivered pursuant hereto, nor any agreement to be entered into pursuant hereto or any provision hereof, is intended to create any right, claim or remedy in favor of any person or entity, other than the parties hereto and their respective successors and permitted assigns and any other parties indemnified under Article XI. A321
 
 
 7
 As a condition to closing, the SPA also required BI to obtain approvals from various Indian governmental agencies. The deadline for applying for the approvals was November 7, 2001.
 
 
 8
 The SPA also contained two interrelated provisions pertaining to Dalal's compensation, which the District Court found to be in tension with the Negating Clause. The first, Section 3.16, identified Dalal as the broker for the sale and indicated that he would be paid under a separate agreement in a Disclosure Schedule of the SPA. That clause provided that, except as set forth in the Disclosure Schedules, "no broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement." The second provision, Disclosure Schedule 3.16 of the SPA, further indicated that EasyLink had an agreement "with Sandeep Dalal pursuant to which he is entitled to fees payable upon the terms and conditions set forth therein." As we discuss below, the District Court incorrectly concluded that these provisions precluded enforcement of the Negating Clause.
 
 
 9
 On the same day that EasyLink and BI signed the SPA, Dalal and EasyLink signed the Third Agreement, which changed his compensation scale to provide for a commission of 12.5% of the total consideration in the event that the transaction closed and, unlike the First Agreement, did not require EasyLink to accept any offer over $500,000.
 
 
 10
 Prior to the November deadline for obtaining the required regulatory approvals from the Indian government, BI was prepared to apply, but the application depended, in part, on cooperation from EasyLink's legal counsel. However, EasyLink's lawyers suspended their services because of unpaid bills and as a result, the application could not be completed and the deadline was not met. Nonetheless, after the deadline, the parties continued their joint efforts to obtain the necessary government approvals until EasyLink ultimately terminated the SPA in December.
 
 
 11
 EasyLink sought to justify the termination on the ground that BI had failed to secure the approvals by the deadline specified in the SPA. EasyLink informed BI, however, that it still wanted to pursue the transaction and, at that point, sought to renegotiate and offered new terms. Dalal contends that EasyLink intentionally failed to close the transaction to avoid paying his commission, that it planned to consummate the transaction later without him and that the lack of governmental approvals rationale was pretextual.
 
 
 12
 Litigation ensued and both EasyLink and Dalal pursued a variety of contract claims. EasyLink asserted claims that included, among others, claims for breach of contract, for breach of fiduciary duty and for breach of the covenant of good faith and fair dealing, and additionally sought a declaratory judgment that it had not breached its agreements with Dalal. Dalal counterclaimed for, inter alia, breach of contract and of the implied covenant of good faith and fair dealing. He also sought recovery on the SPA as a third-party beneficiary.
 
 
 13
 In accordance with the District Judge's individual rules for civil bench trials, and in advance of trial, the parties simultaneously submitted the direct testimony of their trial witnesses by affidavit, as well as their documentary evidence, findings of fact, conclusions of law, and trial briefs.[2] In a pre-trial conference on December 4, the court, in accordance with its individual practices, advised the parties that it would consider only those claims and defenses for which the parties had provided legal support in their pre-trial submissions, and proceeded to lay out what it believed to be the claims and defenses. At the trial held on December 9, the parties made brief opening statements, offered objections to evidentiary submissions, presented oral summations and at the end of the day were provided with the court's first opinion addressing various issues thought at the time to be dispositive.
 
 
 14
 These individual procedures, which normally can be conducive to efficiencies and considerable savings in cost and time, had the unintended effect—in the unusual circumstances presented here—of generating a record that obscured which arguments had, or had not been, properly presented to the court. As a consequence, the procedural posture of the case is unusually complicated. The trial resulted in three successive opinions by the District Court—issued on December 9, 2002, February 20, 2003 and September 10, 2003—each reversing the one prior.
 
 
 15
 The District Court's unreported first opinion ("India.com I") concluded that EasyLink had breached the SPA by itself causing the condition precedent upon which it relied to terminate the agreement. The court held that by failing to pay the fees of its legal counsel in India, EasyLink had prevented BI from applying for governmental approvals prior to the deadline in the SPA. "Having caused [BI] to miss the [government approval] application deadline, EasyLink could not rely on this failure to terminate the contract." Having concluded that EasyLink had breached the SPA, the District Court then held that Dalal could recover as a third-party beneficiary of the SPA.
 
 
 16
 The District Court reasoned that the specific identification of Dalal in Disclosure Schedule 3.16 as a broker entitled to payment overcame what it perceived as the general language of the Negating Clause, which explicitly precluded the existence of, or recovery by, third-party beneficiaries. The court dismissed the Negating Clause as mere "boilerplate language" and reinforced its interpretation of the SPA by reference to extrinsic evidence, noting that because EasyLink and Dalal had specifically bargained for his inclusion in the SPA as a named broker, EasyLink intended him to be a beneficiary.
 
 
 17
 While the District Court focused most of its attention on the question of Dalal's third-party beneficiary status, it also rejected Dalal's claim that he was entitled to relief as a consequence of EasyLink's breach of the brokerage agreements. In particular, the District Court found that the "third agreement made any payment to Dalal entirely dependent on the SPA and the payment of consideration by BI." Therefore, the District Court concluded that Dalal's only direct contractual right that survived the expiration of the First Agreement was his right (under the Third Agreement) to the 12.5% commission if the transaction closed. The District Court entered judgment for Dalal and against EasyLink in the amount of $931,364.
 
 
 18
 EasyLink moved pursuant to Rule 59 to amend the judgment or, in the alternative, for a new trial. EasyLink argued that under New York law negating clauses, such as the one in the SPA, are enforceable, dispositive, and preclude recovery by third-party beneficiaries. In response, Dalal argued that EasyLink had waived the argument by not highlighting it to the District Court and that, in any event, the District Court's conclusion on that issue had been correct.
 
 
 19
 The District Court agreed with EasyLink and issued its second opinion on February 20, 2003 reversing its December 9, 2002 Opinion. India.Com, Inc. v. Dalal, 2003 WL 359293, 2003 U.S. Dist. LEXIS 2305 (S.D.N.Y. Feb. 20, 2003) ("India.Com II"). The District Court now held that, because of the presence of the Negating Clause, its earlier opinion had incorrectly concluded that Dalal was a third-party beneficiary. This time it ordered the entry of judgment for EasyLink. Id.
 
 
 20
 In a further twist, following the District Court's second decision, Dalal moved under Rule 59 to amend the new judgment. Dalal again argued, inter alia, that EasyLink had waived its right to rely on the Negating Clause because it had not raised the issue at trial. At this point, the District Court reversed itself for the second time, and reinstated its first decision. India.Com, Inc. v. Dalal, 2003 WL 22093475, 2003 U.S. Dist. LEXIS 15660 (S.D.N.Y. Sept. 10, 2003) ("India.Com III").
 
 
 21
 In its third opinion, the District Court concluded that EasyLink had not relied at trial on the theory that the Negating Clause prevented recovery under a third-party beneficiary claim and that EasyLink's trial submissions did not contain a "defense" specifically targeting the third-party beneficiary claim. The District Court concluded that Dalal had been prejudiced by these omissions because he had been denied the opportunity to elicit further evidence and to respond with appropriate legal arguments, including an equitable estoppel argument. The District Court found that EasyLink was not entitled to relief under Rule 59 for a defense it had not presented at trial. Because it granted Dalal recovery as a third-party beneficiary, the court deemed it "unnecessary to discuss at length [Dalal's] two alternative arguments supporting his right to recovery." India.Com III at *22. The court ordered the reinstatement of its original judgment for Dalal. This appeal ensued.
 
 DISCUSSION
 I. The Standard Of Review
 
 22
 Generally, we review questions of law de novo, questions of fact for clear error, and motions under Rule 59 for abuse of discretion. Benjamin v. Fraser, 343 F.3d 35, 43 (2d Cir.2003) (quotations omitted); Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir.2004). In light of the successive Rule 59 motions and decisions below, we note that a district court abuses its discretion when its decision is premised on errors of law. Shain v. Ellison, 356 F.3d 211, 214 (2d Cir.2004). New York law applies in this diversity action.
 
 
 23
 II. The Enforceability of the Negating Clause
 
 
 24
 In its first opinion, the District Court reasoned that "the specific identification of [Dalal] in the contract supersedes the general language" in the Negating Clause, which explicitly excluded any third-party beneficiaries from recovery under the SPA. It found that the contractual provisions in question were not ambiguous, but, at the same time, concluded that "to the extent that there is any ambiguity in this regard, Dalal and EasyLink specifically bargained for Dalal's inclusion in the SPA as an intended beneficiary of it." Thus, the District Court concluded that the identification of Dalal in Section 3.16 of the SPA and in Disclosure Schedule 3.16 together established him as a third-party beneficiary.
 
 
 25
 We disagree. The Negating Clause, entitled "No Third Party Beneficiaries," clearly provided that no "Schedule" was "intended to create any right, claim or remedy in favor of any person or entity other than the parties hereto" for anyone other than the parties. A321. In other words, since the parties' intention to benefit the third-party must be apparent from the contract, the text of the SPA specifically foreclosed the theory of recovery on which Dalal and the District Court relied. See, e.g., In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F.Supp. 712, 733 (S.D.N.Y.1989); Port Chester Elec. Constr. Corp. v. Atlas, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976) ("It is old law that a third party may sue as a beneficiary on a contract made for his benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts.") (internal citations omitted).
 
 
 26
 Dalal and the District Court were distracted by a line of New York cases addressing the issue of whether a broker's commission is due after a sale has been consummated. The cases typically hold that where a broker is expressly identified in a contract which references an obligation to pay a broker its commission, the broker is entitled to recover as a third-party beneficiary. See, e.g., Cauff, Lippman & Co. v. Apogee Fin. Group, 807 F.Supp. 1007, 1020 (S.D.N.Y.1992) (permitting recovery by a third-party beneficiary because the broker was expressly identified in the contract and the contract referenced the brokerage's obligation to pay his commission); Ambrose Mar-Elia Co. v. Dinstein, 151 A.D.2d 416, 543 N.Y.S.2d 658, 660-61 (1st Dep't 1989) (concerning the allocation of a commission once a sale had closed); Edward S. Gordon Co. v. Blodnick, Schultz & Abramowitz, P.C., 150 A.D.2d 212, 540 N.Y.S.2d 816 (1st Dep't 1989) (concerning a sublease transaction that had closed). These cases stand for the unremarkable proposition that, in the absence of negating language, the naming of a broker in a contract reflects an intention to benefit the broker, and thus confers third-party beneficiary status. They do not examine the issue, which is dispositive here, of the relationship between commission clauses and negating clauses.
 
 
 27
 Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: "[w]here a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, ... that provision is decisive." Nepco Forged Prods., Inc. v. Consolidated Edison Co. of N.Y., Inc., 99 A.D.2d 508, 470 N.Y.S.2d 680, 681 (2d Dep't 1984); see Morse/Diesel, Inc. v. Trinity Indust., Inc., 859 F.2d 242, 249 (2d Cir.1988) ("Under New York law, where a provision in a contract expressly negates enforcement by third parties, that provision is controlling."); Schuler-Haas Elec. Corp. v. Wager Constr. Corp., 57 A.D.2d 707, 395 N.Y.S.2d 272, 274 (4th Dep't 1977); see also Edward B. Fitzpatrick, Jr. Constr. Corp. v. County of Suffolk, 138 A.D.2d 446, 525 N.Y.S.2d 863, 866 (2d Dep't 1988) (finding that the construction company was merely an incidental beneficiary, not a third-party beneficiary, to a contract between an architect and the county).
 
 
 28
 For these reasons, we conclude that the mention of Dalal in the contract as a broker entitled to a commission is insufficient to confer third-party status where the parties themselves are explicit that they did not intend to create third-party beneficiaries. In Morse/Diesel we arrived at a similar conclusion. Although there were various provisions in subcontracts that "reflect[ed] and envision[ed] coordinated effort by the various subcontractors," we concluded that these tangential references did not overcome "the explicit negation of third-party beneficiary obligations" found elsewhere in the subcontracts. Morse/Diesel, 859 F.2d at 249. We held that the contracts could not be construed to bestow third-party benefits on other subcontractors. Id. By the same token, Dalal is not a third-party beneficiary of the SPA.
 
 III. Waiver
 
 29
 The District Court found (in its third opinion) that by failing to raise explicitly the Negating Clause as a defense to Dalal's recovery as a third-party beneficiary, EasyLink waived it and thus was not entitled to relief under Rule 59. The District Court observed that EasyLink's "trial submissions did not even contain a defense specifically targeting the third-party beneficiary claim and its opening and closing statements at trial made no reference to the Negating Clause."[3] India. Com III at *21 (footnote omitted). The court declared: "Dalal is correct that he was prejudiced by EasyLink's failure to raise at trial that the Negating Clause barred his recovery as a third-party beneficiary." Id. at *20. After this discussion, the District Court dealt with the Negating Clause as follows: "[E]liminating this defense from the equation, the December 9 Opinion had a more than sufficient factual and legal basis for finding Dalal to be a third-party beneficiary." Id. at *22.
 
 
 30
 We are confused by this reasoning. We cannot agree that EasyLink waived this argument. In its Answer to the counterclaims, EasyLink denied Dalal's status as a third-party beneficiary. The District Court was thus on notice that this was a disputed, potentially dispositive contract question to be addressed and resolved. Moreover, the record demonstrates that, contrary to the District Court's conclusion, throughout the litigation the existence of the Negating Clause was a prominent issue. Both the Clause and the theory that Dalal was a third-party beneficiary were repeatedly mentioned in the District Court proceedings. For example, in its initial decision, the District Court quoted the Negating Clause and eventually ruled that Dalal was a third-party beneficiary of the SPA. The District Court specifically dismissed the Negating Clause as "boilerplate" and "general language" which was superceded by the "specific" language of the Disclosure Schedule. In view of the prominent role that the Negating Clause played throughout the litigation, it is difficult to know precisely the basis on which the District Court concluded that EasyLink failed to raise or to rely on the Clause. In any event, the conclusion was incorrect.
 
 
 31
 While techniques intended to streamline trials and save work for the parties and the courts are highly desirable, in the final analysis this was a breach of contract claim and, therefore, in its evaluation of that claim, the District Court was obligated to consider the text of the contract in relation to applicable law. See, e.g., Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir.2000). More specifically, under New York law, "[e]ffect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms." Reda v. Eastman Kodak Co., 233 A.D.2d 914, 649 N.Y.S.2d 555, 557 (4th Dep't 1996); see also Williams Press, Inc. v. State, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (N.Y.1975) ("We read the writing as a whole. We seek to give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract. . . ."). Since the record shows that the District Court was pointed to, and carefully considered, the Negating Clause, its proper interpretation was not waived and the court was obligated to give the Clause effect.
 
 
 32
 The District Court itself acknowledged that it was confronted with legal arguments about the Clause. For example, in footnote 11 of its second opinion, the court observed that "[a] timely briefing of the Negating Clause issue would have permitted the parties and the Court to address the tension that may exist between two lines of cases addressing recovery under a third-party beneficiary theory." India II at *21. The District Court then refrained from fully undertaking such an analysis. Holding that Dalal could recover as a third-party beneficiary despite the obvious presence—and prominence—of the Negating Clause in the SPA was an error of law. We emphasize that once a District Court endeavors to interpret a contract, it is obligated to correctly identify and apply relevant legal principles and its individual rules cannot be used to relieve it of this obligation.
 
 IV. Breach of the Third Agreement
 
 33
 Although Dalal cannot proceed as a third-party beneficiary, he also sought recovery on another theory that the District Court did not fully reach. Dalal argues that, in violation of New York law, EasyLink wrongfully breached the Third Agreement by terminating the SPA for the purpose of avoiding payment of his commission.
 
 
 34
 The Third Agreement provided that EasyLink was to pay Dalal "a fee of 12.5% of the Aggregate Consideration received from [BI] pursuant to [the SPA]." EasyLink argued below that this constituted a closing-of-title condition. As a general matter, under such a condition, no fee is earned unless the deal is consummated. See Nuvest, S.A. v. Gulf & Western Indus., Inc., 649 F.2d 943, 947 (2d Cir.1981). We believe that this condition in the Third Agreement is properly read as a closing-of-title condition.
 
 
 35
 However, under New York law, closing-of-title conditions are not controlling where the condition's non-fulfillment is wrongfully caused by one of the parties. Id. at 949; Levy v. Lacey, 22 N.Y.2d 271, 276, 292 N.Y.S.2d 455, 239 N.E.2d 378 (1968). Under both contract and agency law, a broker and a principal "owe each other a duty of good faith." Nuvest, 649 F.2d at 947.[4] As a result, "even where the broker and seller expressly provide that there shall be no right to a commission unless some condition is fulfilled, and the condition is not performed, the seller will nevertheless be liable if he is responsible for the failure to perform the condition." Lane—the Real Estate Dep't Store, Inc. v. Lawlet Corp., 28 N.Y.2d 36, 43, 319 N.Y.S.2d 836, 268 N.E.2d 635 (1971).
 
 
 36
 In its first and second decisions the District Court concluded that Dalal had failed to establish a breach of the terms of the Third Agreement, but did not fully address whether EasyLink, in bad faith, caused the SPA not to close, for the purpose of depriving Dalal of his commission. See, e.g., India. Com II at *5-6 ("the third broker contract required a closing of the transaction [but] the transaction had not in fact closed pursuant to the SPA."). In its third opinion, because the District Court found Dalal to be a third-party beneficiary, it did not reach Dalal's alternative theories of recovery. India. Com III at *22.
 
 
 37
 Although the District Court noted that the Third Agreement had a closing-of-title provision, in its first opinion the District Court also found that EasyLink had "improperly terminated" and "prematurely and wrongfully breached" the SPA. The District Court did not reach the question of whether EasyLink's behavior constituted a wrongful termination of the Third Agreement standing alone.
 
 
 38
 In this case, the SPA had already been executed when EasyLink failed to pay its legal fees. Generally, once negotiations have progressed to the point where "agreement on essential terms ha[s] either been reached or [is] imminent, the likelihood of finding a wrongful obstruction of negotiations increases with the completeness of the principals' understanding and with the arbitrariness of the purported grounds for the seller's withdrawal." Nuvest, 649 F.2d at 949.
 
 
 39
 Dalal presented evidence that he worked full-time without compensation for more than six months to find a buyer for ICI and to facilitate the sale. Dalal alleged below that EasyLink intended to negotiate with BI after the breach of the SPA, in order to avoid paying him a commission. Since the issue of whether EasyLink breached the SPA for the express purpose of avoiding Dalal's commission was not fully resolved by the District Court, we remand for further consideration. We intimate no view whatever about the ultimate resolution of this issue.
 
 V. Dalal's Remaining Counterclaims
 
 40
 Dalal has cross-appealed on two additional issues. He first contends that the three brokerage agreements with EasyLink should be read as a single contract, presumably because this would supply an additional theory of breach, since the resulting single contract would contain an obligation for EasyLink to accept any sale in which "the Aggregate Consideration represents a valuation on India.com's entire portal business of at least $0.5 million." Dalal argues that because the Third Agreement incorporated definitions from the First, all the agreements formed part of a single transaction and should thus be read together. However, the circumstances surrounding the creation of the Third Agreement were markedly different from those surrounding the first two agreements. Notably, by October 26, 2001, there was only one prospective buyer.
 
 
 41
 Despite Dalal's arguments, and as the District Court recognized, the three brokerage agreements should not be read together. The Third Agreement—drafted by Dalal himself—superceded the previous agreements and did not extend the terms of the First and Second Agreements. In sharp contrast to the Second Agreement, which explicitly extended the terms of the First by thirty days, the Third Agreement did not extend the expiration period of the First and Second Agreements. It is also significant that the Third Agreement included no reference to the provision in the First that obligated EasyLink to accept any sale offer for more than $500,000. The Third Agreement embodies a new agreement providing that, in exchange for being guaranteed the maximum commission, regardless of timing, Dalal would only be paid if the transaction closed.
 
 
 42
 Dalal also counterclaims that he should recover additional damages because of the decreased valuation of ICI resulting from ICI's forgiveness of the $5 million loan it had made to EasyLink. Dalal argues that if ICI's right to receive $5 million in cash from EasyLink had not been excluded as an asset in the sale of ICI's portal business, Dalal would have been able to sell ICI for $5 million more. However, as the District Court pointed out, Dalal offers no proof that even if the $5 million were included that this would translate into a correspondingly higher sales price for ICI. Additionally, the District Court found that Dalal was told in April 2001 that the loan was not going to be included in ICI's valuation. He continued to work on the transaction nonetheless. We therefore reject Dalal's dilution claim.
 
 CONCLUSION
 
 43
 We reverse the District Court's ruling that Dalal was a third-party beneficiary and set aside the damages awarded by the District Court. We remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 India Holdings, Inc. ("IHI") is the named party in the contract at issue on the third-party beneficiary claim. EasyLink is the parent corporation of both IHI and ICI. The District Court found that the executives of EasyLink made the critical decisions on behalf of ICI and IHI and that EasyLink was liable for the actions of those subsidiaries. Since EasyLink has not challenged that determination on appeal, we refer to both IHI and EasyLink as "EasyLink."
 
 
 [2]
 Both parties consented to this form of trialSee Ball v. Interoceanica Corp., 71 F.3d 73, 77 (2d Cir.1995) (per curiam) ("[W]e approve the procedure allowing the parties to produce direct evidence from their witnesses in writing while permitting subsequent oral cross-examination—particularly when the parties agree to that procedure in advance.").
 
 
 [3]
 The District Court was apparently referring to submissions after the parties' claims had been whittled down during the December 4 conference
 
 
 [4]
 Although by arguing that EasyLink breached its duty of good faith and fair dealing, Dalal did not waive his argument that EasyLink's breach of the SPA caused the failure to close, we note that wrongful termination by the seller need not, however, mean bad faith. Even "arbitrary" terminations can be wrongful for the purpose of this ruleSee Trylon Realty Corp. v. DiMartini, 34 N.Y.2d 899, 359 N.Y.S.2d 284, 316 N.E.2d 718 (1974) (arbitrary decision by seller to withdraw application for zoning variance crucial to parties' sales contract wrongfully deprived broker of commission, and closing-of-title condition was overridden). "Bad faith is not necessarily an essential ingredient to the finding of wrongful prevention." Nuvest, 649 F.2d at 949 (citing Trylon, 34 N.Y.2d at 899, 359 N.Y.S.2d 284, 316 N.E.2d 718).